Argued and submitted February 5, 1999, affirmed January 31, 2001

# STATE OF OREGON,
*Respondent,*

*v.*

# RANDALL JAMES MAXWELL,
*Appellant.*

## (10-97-00429; CA A98951)

18 P3d 438

John Halpern, Jr., argued the cause and filed the brief for appellant.

Janet A. Klapstein, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Deits, Chief Judge,* and Armstrong, Judge.

EDMONDS, P. J.

Armstrong, J., dissenting.

---

* Deits, C. J., *vice* Warren, S. J., retired.

## EDMONDS, P. J.

Defendant appeals from two convictions for sodomy in the first degree, ORS 163.405, after a jury trial. He raises eight assignments of error. We discuss only those assignments that would benefit the bench and the bar. We affirm.

The charges underlying the convictions involve alleged oral-genital contact with a then four-year-old child, K, in September 1996 and alleged oral-genital contact with another then three-year-old child, B, between January and the fall of 1994. Defendant was also charged with sexual abuse of B, but he was acquitted of that charge. At the trial in June 1997, the children, B's mother Kelly, and K's mother Jennifer, testified, as did B's brother, M, who witnessed the contact with B. Although the victims' families were unacquainted with each other, both families were acquainted with defendant. K's family lived down the road from defendant for several years near Junction City. B's family lived several miles away from defendant for a period in 1994, while B's father worked for defendant. In August 1994, B's family moved to the state of Washington.

B, who was six years old at the time of trial, testified about two incidents where she claimed defendant abused her. She said that the incidents occurred when she and other children were playing at defendant's residence. Her brother, M, testified that as to one of the incidents, he went into defendant's residence and saw defendant engaged in activity with B that amounted to sodomy. He watched for about 45 seconds and then left. Because B did not tell her mother about what occurred, M decided not to say anything either. After the family moved to Washington, B reported the incident to her mother, and M then told her what he had seen. Kelly contacted a medical clinic to have B examined, and a criminal investigation ensued.

As to the other conviction, the state's evidence showed that K and her mother, Jennifer, visited defendant at his residence on September 8, 1996, for the purpose of seeing some stray kittens that K had found and had given to defendant. While there, Jennifer and defendant conversed and smoked marijuana together. Later, Jennifer left defendant's

residence briefly, leaving K at defendant's residence. When she returned, she observed that K's playsuit was buttoned incorrectly. She testified that defendant volunteered that he had helped K go to the bathroom. That night, while Jennifer was bathing her, K reported that defendant had engaged in activity amounting to sodomy. Jennifer's husband was out of town. She contacted her mother, to whom K reiterated her report. Jennifer was uncertain about what action to take. She feared her husband's reaction; she was concerned about having to disclose her use of marijuana and the fact that she had prior convictions for negotiating a bad check and harassment. Two days later, she contacted the police for advice, but did not give them any details. A week later, Jennifer filed a formal complaint with the police. As a result, K was interviewed at the Lane County Child Advocacy Center. A videotape of that interview was admitted into evidence.

Defendant also testified at trial. He acknowledged contact with the families but denied any sexual contact with the children. He said that he knew B's family only briefly and that the children visited only when their parents were present. He said that Jennifer and K had visited his residence as they described but that during the time that Jennifer was gone, he was working in his shop and was not with K, who was in the house. He also said that he and Jennifer had smoked as many as four joints of marijuana during the course of her visit. He specifically denied helping K in the bathroom.

■ In his second assignment of error, defendant argues that the trial court erroneously excluded evidence from a witness who was prepared to testify that Jennifer had been observed to smoke marijuana on 50 or more occasions while at defendant's residence. Defendant asserted to the trial court that the evidence was relevant to Jennifer's ability to perceive accurately on September 8. He offered the evidence under OEC 406, which provides:

"(1)   Evidence of the habit of a person * * * is relevant to prove that the conduct of the person or organization was in conformity with the habit or routine practice.

"(2)   As used in this section, 'habit' means a person's regular practice of meeting a particular kind of situation with a specific, distinctive type of conduct."

The trial court ruled that the evidence was not admissible, reasoning that the use of collateral prior bad acts cannot be used to impeach a witness's testimony.

On appeal, defendant argues that the evidence was admissible to demonstrate that Jennifer "had smoked large amounts of marijuana and that it could therefore, reasonably be concluded that she was intoxicated [on September 8]." In her testimony, Jennifer admitted that she had smoked a joint with defendant on that occasion but denied that she had smoked any more than that or that she was "stoned" that day. That testimony conflicted with defendant's testimony about the quantity of marijuana consumed at defendant's residence. Thus, any potential probative value of the proffered evidence is limited to demonstrating that Jennifer smoked more than one joint with defendant.

■   Admissible "habit" evidence under OEC 406 must be evidence that is specific to an issue at trial. In *Charmley v. Lewis*, 302 Or 324, 729 P2d 567 (1986), the plaintiff, a pedestrian, was injured when he was struck by a car operated by the defendant. The crucial issue was whether the plaintiff had the right of way because he was within an unmarked crosswalk when he was struck. The court held that evidence that plaintiff habitually and invariably crossed the street on which he was struck within the unmarked crosswalk was admissible to demonstrate that he was within the crosswalk on the date that he was struck. Here, the fact that Jennifer smoked marijuana at defendant's residence on 50 or more separate occasions does not tend to prove that Jennifer had an invariable habit of smoking more than one joint of marijuana on every occasion. The trial court did not err in excluding the proffered evidence.

■   In his third assignment of error, defendant assigns error to the trial court's granting of the state's motion to exclude evidence that Jennifer had made prior false accusations of sexual abuse of K. Defendant sought to offer evidence that Jennifer had accused K's father of molesting K when she

was an infant. Jennifer denied having made that accusation. According to defendant, the evidence was admissible because Jennifer testified in the state's case about the report of sexual misconduct made by K to her about defendant under OEC 803(18a)(b). Defendant relies on our decision in *State v. LeClair*, 83 Or App 121, 730 P2d 609 (1986), *rev den* 303 Or 74 (1987). In *LeClair*, the defendant argued that the court erred in refusing to admit evidence of allegedly prior false reports of sexual abuse made by the *victim*. We reasoned that false statements about sexual conduct are not statements of "past sexual conduct" within the meaning of OEC 412 (the Rape Shield Law), and therefore, are not subject to OEC 412. Moreover, credibility generally cannot be attacked by specific instances of conduct under OEC 608(2).[1] Nonetheless, we held that

> "regardless of the prohibitions of OEC 608, the Confrontation Clause of Article I, section 11, requires that the court permit a defendant to cross-examine the complaining witness in front of the jury concerning other accusations she has made if 1) she has recanted them; 2) the defendant demonstrates to the court that those accusations were false; or 3) there is some evidence that the victim has made prior accusations that were false, unless the probative value of the evidence which the defendant seeks to elicit on the cross-examination (including the probability that false accusations were in fact made) is substantially outweighed by the risk of prejudice, confusion, embarrassment or delay." *Id.* at 130.

---

[1] OEC 608 provides:

"(1) The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but;

"(a) The evidence may only refer to character for truthfulness or untruthfulness; and

"(b) Evidence of truthful character is admissible only after the character of the witnesses for truthfulness has been attacked by opinion or reputation evidence or otherwise.

"(2) Specific instances of conduct for the purpose of attacking or supporting the credibility of the witness * * * may not be proved by extrinsic evidence. Further, such specific instances of conduct may not, even if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness."

*LeClair's* analysis is helpful to defendant only if the third category in our opinion is extended to alleged prior false accusations made by a nonvictim.[2] Our ruling in that case had its genesis in Article I, section 11, of the Oregon Constitution. Section 11 provides, in relevant part, "[i]n all criminal prosecutions, the accused shall have the right * * * to meet the witnesses face to face." Here, only K and defendant were present during the alleged abuse. Jennifer's testimony pertained to the circumstances leading up to the time when K was left alone with defendant and afterwards. At trial, defendant was afforded the opportunity to cross-examine both K and Jennifer as to their testimony. The proffered evidence constitutes additional evidence first offered by defendant for impeachment purposes. The admissibility of impeachment evidence that Jennifer had made false claims of sexual abuse of K against another person is at odds with OEC 608(2) because it is about a specific instance of conduct offered to attack her credibility. The question then is whether Article I, section 11, requires the admission of the impeachment evidence of Jennifer under the circumstances of this case, despite the provisions of OEC 608(2).

■ As we said in *LeClair,* the requirements of Article I, section 11, are not met simply because defendant had the opportunity to cross-examine the victim about the specific incident with which defendant was charged. The right of confrontation includes the right to engage in effective cross-examination to impeach witnesses who are called by the state. *Id.* at 128. However, a defendant's confrontation right is not absolute, and courts have discretion to impose reasonable limits on cross-examination if the evidence will confuse the jury, will unnecessarily delay the trial or is only marginally relevant. *LeClair,* 83 Or App at 129. Here, defendant's proffered testimony does not meet the requirements for admissibility under *LeClair,* even if we were to extend its holding to nonvictim witnesses.

---

[2] In *LeClair,* there was evidence that the victim's mother had made reports to the authorities about past sexual abuse of the victim. Both the mother and the child denied the reports and the alleged abuse at a later time. We ruled that the evidence did not establish false claims made by the victim on that record.

In defendant's offer of proof, witness Donna Wickwire was asked if Jennifer told her why she had moved to the neighborhood. Wickwire answered:

"The entire story was very well circulated by Dean[3] and his father, Dick Sr., especially in the presence of Jennifer. But numerous times, and without Jennifer present, that the reason she moved to the neighborhood is that she was getting divorced from her husband and her husband had sexually molested [K] as a young infant, baby child. There were times she had to go into court, she said, to face those charges and explain what those charges were. She had to take [K] with her.

"Q. And Jennifer told you this?

"A. Yes. She was in the room many times. The story is very well known.

"Q. The stories were told in front of [Jennifer]?

"A. Yes.

"Q. She never corrected them.

"A No sir. That's what all of us believed. It had gone on more than one occasion[.]"

Defendant also called Jennifer as a witness in his offer of proof.

"Q. Mrs. Skiller, have you claimed that Jason Berk—who is Jason Berk?

"A. [K]'s real father. He died.

"Q. He died. He was hit by a car?

"A. Yes.

"Q. Have you ever claimed that he has molested [K]?

"A. No, never.

"Q. Never?

"A. Never. He never hurt her, but he just wasn't the greatest—you know, wasn't a nurturing father. He never touched her in any way, but he just wasn't very nurturing.

---

[3] Dean Skiller is Jennifer's husband, and Dick Sr. is her father-in-law.

"Q. So he did not, to your knowledge, molest [K]?

"A. No.

"Q. The question would be, have you told other people that he did?

"A. No, never."

As we said in *LeClair*, Article I, section 11, trumps OEC 608 only when the defendant has demonstrated that the witness has recanted prior accusations or that the witness made prior accusations that are demonstrably false. In addition, the probative value of the evidence must substantially outweigh the risk of prejudice, confusion, embarrassment or delay. Here, defendant's evidence falls short of those requirements. The evidence does not show that Jennifer made accusations of sexual abuse against her former husband and then admitted that the reports were false. Instead, there is a factual dispute whether she ever made such statements. The fact that she testified that she did not make the accusations makes the issue a collateral matter on which the admission of evidence would have unnecessarily delayed the trial and confused the issues before the jury. Also, the evidence that Jennifer said that her former husband molested K has marginal relevance to the impeachment of her testimony regarding defendant's case. Defendant's theory of the case is that Jennifer fabricated the report and taught K to repeat it. The fact that she purportedly claimed in a divorce proceeding that her former husband had molested K as a "young infant, baby child" does little to support defendant's theory. Consequently, we conclude that the trial court did not abuse its discretion in excluding defendant's offer of proof.

■ ■ In his sixth assignment of error, defendant argues that the trial court erred when it excluded the testimony of witnesses Southerton and King regarding Jennifer's character for truthfulness. In *State v. Caffee*, 116 Or App 23, 27, 840 P2d 220 (1992), *rev den* 315 Or 312 (1993), we held that our standard of review under OEC 608(1) is for an abuse of discretion. An abuse of discretion on an evidentiary ruling by a trial court occurs when the court's ruling exceeds the range of all legally correct discretionary choices. In that context, "discretion" refers to the authority of the trial court to choose

among several legally correct outcomes. *State v. Rogers*, 330 Or 282, 312, 4 P3d 1261 (2000). Jennifer worked for Southerton for three weeks in 1996 at a daycare center. Southerton was prepared to testify that, in her opinion, Jennifer "was not truthful." In an offer of proof, Southerton testified that her opinion was based only on the fact that Jennifer had not disclosed on her employment application that she had prior criminal convictions. The prosecutor objected on the ground that a sufficient foundation had not been supplied for the admission of Southerton's opinion. She argued that one act, susceptible of competing inferences of mistake or dishonesty, during a three-week period of contact between Southerton and Jennifer, was not a sufficient basis upon which to render an opinion under OEC 608(1). The parties and the trial court discussed the issue at length, and defense counsel pointed out that the rule permits both personal opinion and reputation testimony. The trial court concluded that the foundation was insufficient for the witness to testify about community reputation for truthfulness. It then returned to the prosecutor's point about opinion testimony, asking defense counsel if he had case authority for the proposition that a witness is permitted to render an opinion "based on that single circumstance." Defense counsel conceded that he could produce no such authority. He replied, "She formed an opinion. And it is based upon something that happened. So we think that's a sufficient foundation for offering her opinion to the jury." The court responded, "[t]he objection is sustained upon lack of foundation."

Based on that record, defendant and the dissent contend that the trial court erred. In a global approach to the issue, the dissent would reverse because it believes that the trial court erred by failing to distinguish between the foundation required for personal opinion testimony and the foundation required for reputation testimony in making its ruling. We understand the record differently. The focus of the trial court was on whether the single circumstance in this case could suffice to give rise to *either* an admissible personal opinion *or* an opinion about community reputation concerning character for untruthfulness.[4] In that light, any distinction between required foundations as proffered by the dissent

---

[1] The court told defense counsel, in part:

is academic to determining whether the court's ruling was an abuse of discretion.

■■■■    The nature of character evidence is that it "is evidence of a particular human trait. * * * A person's character with respect to truthfulness means that person's propensity to tell the truth in all the varying situations of life." *State v. Marshall*, 312 Or 367, 372, 823 P2d 961 (1991). Thus, under the rule, a character trait for untruthfulness is distinguishable from individual acts of untruthfulness. Also underlying the provisions of OEC 608(1) is the requirement that a foundation be laid before an opinion about a character trait is admissible. Kirkpatrick explains:

> "A character witness, whether testifying as to reputation or opinion, will not be allowed to testify until a foundation has been laid showing that the witness has either sufficient acquaintance with the reputation of the person in the relevant community or sufficient personal contacts with the individual to provide a basis for an opinion regarding that person's character. The contact must have been recent enough so there will be a current basis for the testimony." Laird C. Kirkpatrick, *Oregon Evidence*, 166-67 (3d ed 1996).

We agree with the trial court that it was not required to admit Southern's testimony. To hold otherwise would mean that the distinction between character traits and individual misdeeds would be obliterated. Accordingly, we reject defendant's claim of error in that regard.

■■■■    Witness King worked for defendant. He testified that he saw Jennifer at defendant's residence more than 40 to 50 times. He was asked:

> "Q.   Based on your contacts with Jennifer, did you form a personal opinion as to her credibility, her character for truthfulness?
>
> "A.   Yes.
>
> "Q.   What is your opinion about [Jennifer's] truthfulness?
>
> "A.   Very slim.

---

"It may be a situation in which a job is the most important thing to someone. And they're willing to make a false statement, which is not representative at all with respect to, number one, community opinion with respect to the truthfulness—or the character of that person for truthfulness."

"Q. Are you saying she's truthful or untruthful?

"A. Untruthful.

"Q. Now, you're indicating—do you have an opinion or knowledge of her reputation among other people for truthfulness?

"A. No Sir."

Apparently, the trial court ruled that King's contacts with Jennifer were an inadequate basis on which to form a personal opinion of her character for truthfulness. We disagree. Their contacts occurred over a period from 1994 to 1996 and involved numerous personal contacts. We conclude that defendant laid an adequate foundation for the admission of King's testimony.

■ In his seventh assignment of error, defendant argues that the trial court erred in excluding testimony by witness Wickwire regarding K's character for truthfulness. Wickwire lived about 400 feet away from defendant and has a daughter who was a playmate of K's. Wickwire operates a day care center at her house. She testified that K came to her house to play, that she saw her in the grocery store and in shopping malls, and that she saw K when she went to K's residence or when K's mother came to her house. She testified that when K came to play with her daughter, there would be "[m]any times" that she would have conversations with K and that she often would listen while K was conversing with her daughter. Wickwire was prepared to testify that in her opinion, K was "not always truthful," but the trial court excluded her testimony. It did not explain its reasoning on the record. We hold that defendant demonstrated that Wickwire had sufficient acquaintance with K for Wickwire to render an opinion as to K's character for truthfulness.

■ ■ In his eighth assignment of error, defendant argues that the trial court erred in excluding character testimony from witnesses King, Coonradt and Berry regarding B's mother, Kelly's, character for truthfulness. In 1994, both B's father and King worked for defendant. King testified that the last time he saw Kelly was about a week before her family moved to Washington in 1994. He testified that while at

defendant's workplace, he would encounter Kelly on a "weekly" basis. He was asked:

"Q. Are you familiar with the reputation of [Kelly] for truthfulness?

"A. Yes.

"Q. What is her reputation for truthfulness?

"A. Poor.

"Q. Do you also have a personal opinion about Kelly's truthfulness?

"A. Yes.

"Q. What is your personal opinion of her truthfulness?

"A. She doesn't know what the word means."

The trial court, relying in part on our holding in *Caffee*, ruled that King had insufficient contacts with Kelly to be permitted to express his opinions before the jury. In *Caffee*, we held that the trial court did not err by excluding a defense witness's opinion testimony about the victim's truthfulness on the grounds of remoteness and inadequacy of contacts.[5] The witness had known the victim from childhood but had had very little recent personal contact with the victim or with other people who knew the victim. Instead, her opinion was predicated on letters that she had received from the victim. *Caffee* is instructive because it illustrates the need for a recent and adequate acquaintance with the person's reputation in the community or with the person who is the subject of the opinion before an opinion about character is admissible. Thus, the rule of *Caffee* can be stated as follows: The admissibility of evidence of prior character to prove present character depends on whether, in the discretion of the trial court,

---

[5] McCormick describes the rule that we applied in *Caffee* in this fashion:

"The crucial time when the character of the witness under attack has its influence on his truth-telling is the time when he testifies. But obviously reputation takes time to form and is the result of earlier conduct and demeanor. Hence, the reputation does not reflect character exactly at the trial date. The practical solution is to do what most courts actually do, that is, (1) to permit the reputation-witness to testify about the impeachee's 'present' reputation as of the time of the trial, if he knows it, and (2) to accept testimony as to reputation as of any time before trial which the judge in his discretion finds is not too remote[.]" *McCormick on Evidence*, 173-74 (5th ed 1999) (footnotes omitted).

the contacts on which the opinion is based are frequent enough *and* recent enough to have probative value to the testimony given in court. *See also* 3A *Wigmore, Evidence* § 928 (Chadbourn rev 1970).

Here, King's contact with Kelly was while King was working at defendant's work site in 1994. As King testified, "I would show up and she would be there already, or I would be there and she would show up." He said, "Whatever we were working on, she would be in the way." He agreed that, during those times, the focus of his attention was on his work. The question is whether, in light of King's testimony, the trial court abused its discretion by excluding the proffered evidence. The trial court correctly recognized the rule that the admissibility of evidence of prior character to prove present character will depend on the probative value for impeachment purposes of the testimony offered. The application of that rule results in the possibility of more than one legally correct outcome, as McCormick's and Wigmore's writings and *Caffee*'s holding instruct. It does not matter whether this court, sitting as the trial court, would have admitted the evidence. What does matter is whether the trial court's ruling was within the range of legally correct choices and produced a permissible legally correct outcome. *Rogers*, 330 Or at 312. We hold that the trial court could properly conclude that King's opinion about Kelly's character for truthfulness was based on contacts so remote that they would not ordinarily create an impression about character, particularly when the issue was Kelly's character at the time of trial. Consequently, the trial court did not abuse its discretion when it excluded King's opinion as to Kelly's character.

Debbie Coonradt testified that she met Kelly in 1994 when B's family lived on her property for six or seven weeks. She said that she interacted with Kelly on a daily basis during that time. When asked about her personal opinion as to Kelly's character for honesty, she replied, "[n]ot very good." When asked what Kelly's reputation was in the community, Coonradt said, "[v]ery poor." She testified that she had no contact with Kelly since that time. The trial court excluded the evidence for the same reason that it excluded King's testimony about Kelly. Under the circumstances, the trial court could properly conclude that Coonradt did not have recent

contacts sufficient to enable her to offer an opinion that would reflect on the truthfulness of Kelly's testimony in 1997. We hold that there was no abuse of discretion when the trial court excluded Coonradt's opinions.

Regarding Kelly's character for truthfulness, witness Berry was asked whether he knew her. He answered, "I have met Kelly." The following testimony ensued:

"Q. Did you form enough contact with [Kelly and her husband] to have an opinion about their credibility[?]

"A. Yes.

"Q. And what was your

"A. I didn't have a very good opinion of their credibility.

"Q. That's specifically with regard to [Kelly]?

"A. Yes.

"Q. How about—did you have knowledge of her reputation among others in the community?

"A. No."

Again, the trial court ruled that the foundation laid by defendant for the admissibility of Berry's opinion was inadequate. We agree that its decision was a permissible exercise of its discretion in light of our prior holdings.

The dissent would reach a contrary conclusion regarding defendant's eighth assignment of error. As we understand its position, it believes the rule to be that "[a]lthough remoteness from the time of trial is a basis for excluding reputation evidence, it is usually not a basis for excluding opinion evidence." 172 Or App at 167 (Armstrong, J., dissenting). From that premise, it concludes (as it would have in regard to defendant's sixth assignment of error) that "[i]n excluding the opinion testimony of three of the witnesses because of its remoteness, the trial court relied on an incorrect understanding of the foundation requirements for opinion testimony." *Id.* at 168. Again, our reading of the record differs from that of the dissent. The trial court's rulings were not predicated on any purported foundational differences between opinions based on personal contacts and opinions

based on community reputation. Thus, the dissent in its reasoning has assigned a fictional basis for the trial court's exercise of discretion. Rather, as we have said, the trial court took its cue from *Caffee*, focusing on whether the contacts on which the opinions were based were frequent and recent enough to have probative value to the testimony given in court. Thus, the dissent's reasoning reduces to the proposition that it would have exercised its discretion differently, had it been the trial court.

██ ██ In summary, the only rulings of the trial court with which we disagree are the exclusion of King's testimony regarding his opinion about Jennifer's character for truthfulness and the exclusion of Wickwire's testimony about K's character for truthfulness. The question remains whether those erroneous rulings require reversal of defendant's convictions. "Evidential error is not presumed to be prejudicial." OEC 103(1). Nonetheless, a trial court's erroneous ruling requires reversal unless there is little, if any, likelihood that the error affected the jury's verdict. *State v. Montez*, 324 Or 343, 927 P2d 64 (1996), *cert den* 520 US 1233 (1997). We do not agree with defendant's arguments that the court's rulings regarding Jennifer and K's character for truthfulness could have affected the jury's verdict regarding B. The charges pertaining to B involved acts that were discrete from the one regarding K. Moreover, defendant was acquitted on one of those charges. We affirm the conviction of defendant regarding B.[6]

██ Regarding Jennifer's credibility, defendant testified and denied that any abuse had occurred. He was allowed to offer evidence that Jennifer had been convicted for negotiating a bad check. He was also permitted to offer the testimony of Wickwire that, in her opinion, Jennifer was "untruthful"; the testimony of Darden that Jennifer was "not truthful"; and the testimony of Berry that Jennifer "was not very credible" and that her reputation for truthfulness was "bad." King's opinion that Jennifer was "untruthful" is cumulative of the

---

[6] The dissent undertakes a harmless error analysis as to defendant's conviction for sodomizing B based on its perception that the court erred in excluding the testimony of witnesses who were prepared to testify as to the truthfulness of Kelly, B's mother. As we have held, the court did not abuse its discretion in excluding the testimony of Coonradt, King and Berry in that regard.

testimony of Wickwire, Darden and Berry. We do not perceive how its admission could have affected the jury's verdict when the similar testimony of three other witnesses was unpersuasive. We conclude there is little likelihood that admitting King's testimony could have affected the jury's verdict regarding K. *See, e.g., State v. Coleman*, 130 Or App 656, 664, 883 P2d 266 (1994), *rev den* 320 Or 569 (1995) (holding that no prejudicial error occurred from the denial of the defendant's motion to suppress when the evidence sought to be suppressed duplicated other evidence properly admitted in evidence).

■ The trial court's exclusion of Wickwire's testimony about K's character is a closer question. The state's evidence against defendant included K's testimony, Jennifer's report of K's statements to her, testimony from K's grandmother to whom K also reported her version of what had occurred, the videotape made of K at the Lane County Child Advocacy Center and the testimony of a police officer about Jennifer's report of the matter to the police. There was no incriminating physical evidence offered by the state. The only two people who were present when the alleged sodomy occurred were defendant and K. Thus, the jury was required to determine whether the state had proved its charge beyond a reasonable doubt based on the conflicting testimony of defendant and K and it could be argued that the jury's verdict had to turn on the credibility of K. Wickwire, had she been permitted to testify, would have testified that K was "not always truthful." She was the one defense witness who had had extensive contact with K, and the jury heard no other comparable testimony from any disinterested witness with the same degree of acquaintance. It would follow that K's credibility was an important issue to the jury's consideration of the case.

On the other hand, an examination of defendant's theory at trial undercuts the notion that Wickwire's testimony was material to his case. Defendant's theory at trial was not that K had fantasized or had made up the story that she had been abused; instead, it was that she had been coached to testify that defendant "[l]icked my pee pee."[7] Defendant expended much effort in an attempt to show that

---

[7] In closing argument, defense counsel told the jury:

Jennifer was not a credible person and that the accusation against him was prompted by the dishonest adults in K's life. Wickwire and other defense witnesses were allowed by the court to express opinions about Jennifer's character for truthfulness. Moreover, defendant elicited from K during cross-examination that she had talked to the prosecutor, her mother, her stepfather, and her grandmother about "what you have to say [in court]" and that they "helped [her] practice what to say."[8]

Under the circumstances, we are not persuaded that the admission of Wickwire's opinion of K's character for truthfulness would have materially advanced defendant's theory of the case. In litigating the issue of K's credibility as compared to his, defendant was faced with the problem of explaining why a four-year-old neighbor child would accuse him of sexual abuse. A trier of fact could infer from ordinary knowledge that, in general, most four year olds are not always truthful but, also, that it would be improbable under the facts of this case that K would have falsely accused defendant by herself or made up a story on her own. Through his cross-examination of K and Jennifer, defendant was able to create the very inference that he desired the jury to draw from Wickwire's testimony—that Jennifer had prompted K to claim that defendant had abused her. Wickwire's opinion evidence that K is "not always truthful" is merely cumulative of that testimony and adds little to it if, as defendant argues, K was merely the tool of her mother's dishonesty. Thus, as defendant chose to try the case, the issue of credibility became a swearing match between Jennifer and defendant. In that context, the opinion that K is not "always truthful" is, on its face, of little weight. We conclude that, in light of defendant's theory of defense and the relative weight of Wickwire's opinion testimony, there is little likelihood that the trial

"[Jennifer] knows darn good and well she's taking her daughter down to the Child Advocacy Center to be videotaped, to make a statement about Randy Maxwell allegedly licking her pee-pee.

"[Jennifer] knows that's what the whole case is about. And she agrees that she informed her daughter, [K], that that's what was going on there. And you can conclude, based upon the circumstances that you heard described, that she talked to her about what she was going to be asked and what she was going to say; and in fact practiced her testimony with her."

[8] On redirect examination, K reasserted the truthfulness of her accusation.

court's exclusion of that portion of her testimony affected the jury's verdict.[9]

Affirmed.

**ARMSTRONG, J.,** dissenting.

I disagree with the majority's conclusions that the trial court acted within its discretion by excluding some of defendant's proffered opinion evidence about the character for truthfulness of certain state witnesses and that the trial court's error in excluding other portions of that evidence was harmless. The majority's conclusion that the trial court had the discretion to exclude testimony by several of defendant's opinion witnesses is based on its failure to distinguish between the foundational requirements for reputation and opinion evidence. Its conclusion that the exclusion of testimony by other opinion witnesses was harmless is based on its flawed assumption that, as long as impeachment testimony from at least one witness is permitted, similar testimony from other witnesses can properly be viewed as cumulative. I disagree with both conclusions and, therefore, respectfully dissent.

Defendant assigns error to the trial court's exclusion of testimony by some of his witnesses for lack of a proper foundation. The majority concludes that the trial court's exclusion of several of the witnesses was proper. In reaching that conclusion, it ignores the well-settled distinction between the foundational requirements for reputation and opinion evidence. Because I would join the vast majority of other courts in concluding that a trial court has considerably less discretion to exclude opinion witnesses for lack of foundation than it does to exclude reputation witnesses, I would hold that the trial court erred as a matter of law in this case in excluding several of defendant's opinion witnesses. Moreover, I would hold that the trial court committed at least one

---

[9] The dissent advances a number of reasons why it believes that the excluded evidence could have affected the jury verdict as to K. Hypothetically, those reasons could make sense under different circumstances, had the case been tried as the dissent posits. However, our determination about whether the erroneous exclusion of evidence had little likelihood of affecting the jury's verdict necessarily requires us to examine the trial court's rulings in the context of defendant's theory of the case and the evidentiary record as a whole, and not in the abstract.

reversible error with respect to each count of which defendant was convicted. Accordingly, I would reverse defendant's sodomy convictions.

OEC 608 governs the admissibility of reputation and opinion evidence. In most respects, the language of OEC 608 is substantially the same as that of the federal rule, FRE 608.[1] Because Oregon courts have not yet addressed the precise foundation required for opinion evidence under OEC 608, I would look to interpretations of FRE 608 and similar state rules in construing Oregon's rule. Unlike the majority, I would rely on that authority to conclude that the foundational requirements for opinion evidence differ from the requirements for the admission of reputation evidence.

OEC 608 provides that "[t]he credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but * * * [t]he evidence may refer only to character for truthfulness or untruthfulness[.]" OEC 608(1)(a). The trial court correctly concluded that foundations must be established for both reputation and opinion evidence about a witness's character for truthfulness. *See, e.g., State v. Caffee*, 116 Or App 23, 27, 840 P2d 720 (1992), *rev den* 315 Or 312 (1993); Charles Alan Wright and Victor James Gold, 28 *Federal Practice and Procedure* § 6114, at 53-54, 60-62 (1993). However, both the trial court and the majority failed to address whether the foundational requirements for reputation and opinion evidence differ. Because opinion evidence tends to be more reliable than reputation evidence and because its defects are more easily exposed on cross-examination,[2] I would follow the time-honored distinction between the foundational requirements recognized in other jurisdictions for the two types of character evidence.

---

[1] The crucial difference between the two rules is that the federal rule allows cross-examination about specific acts of untruthful conduct while the Oregon rule does not permit such an inquiry. *Compare* OEC 608(2) *with* FRE 608(b).

[2] Although the federal rationale for the relatively low foundational requirements for opinion evidence is not entirely applicable to the state rule because the federal rule, FRE 608(b), allows cross-examination into the specific acts that form the basis for the character witness's opinion, while OEC 608(2) does not, I am persuaded that much of the federal rationale for the foundational requirements for opinion evidence is applicable to the Oregon rule and that the inherent differences between reputation and opinion evidence compel the different foundational requirements for them.

Accordingly, I would hold, as a matter of law, that the foundational requirements were satisfied for testimony by several of the excluded opinion witnesses.

As several federal and state courts have acknowledged,

" 'no prerequisite conditioned upon long acquaintance or recent information about the witness [is required for the admission of opinion evidence]; cross-examination can be expected to expose defects of lack of familiarity and to reveal reliance on isolated or irrelevant instances of misconduct or the existence of feelings of personal hostility toward the principal witness.' "

---

First, in spite of the fact that no inquiry into specific acts is permitted in state court, cross-examination can still be used to reveal most defects in the bases for opinion testimony, such as personal hostility toward the witness who is the subject of the opinion testimony or a limited relationship with the witness. Moreover, if the trial court determines that the character witness's opinion is based on irrelevant instances of misconduct, it is free to exclude the testimony.

There also are inherent differences between reputation and opinion evidence that lead to their different foundational requirements. Reputation evidence is necessarily based on hearsay, a form of evidence that the law has traditionally viewed as suspect. Because of the potential unreliability of reputation evidence, it is appropriate to require those testifying about a person's reputation to show long acquaintance with the person to be impeached, the community in which she lives, and the circles within which she moves. Without those safeguards, the risk is great that the reputation evidence will be completely unreliable because it will be based on unrepresentative opinions of a few out-of-court declarants that may themselves be based on irrelevant acts of the witness to be impeached. *See, e.g.*, Charles Alan Wright and Kenneth W. Graham, Jr., 22 *Federal Practice and Procedure* § 5265, at 583 (1978) (stating that opinion evidence generally tends to be more reliable than reputation evidence). In contrast, when a character witness testifies as to her opinion, the rules require that the opinion be based on personal knowledge. *See id.* § 5265, at 584. The personal knowledge requirement obviates the need for the additional foundational requirements of reputation evidence. Moreover, because the opinion witness testifies from her personal knowledge, cross-examination can be expected to reveal defects in the bases of her testimony that could not be as readily revealed, or revealed at all, in the cross-examination of a reputation witness. *See* John B. Weinstein, 4 *Weinstein's Federal Evidence* § 608.13[2], at 608-25 (2d ed 1997). Finally, because a reputation witness claims to speak for the community, whereas an opinion witness merely offers a personal view, a jury is likely to give more weight to the testimony of the reputation witness. The greater persuasive force of reputation testimony justifies the higher foundational requirements. Thus, although the Oregon Legislature has determined under OEC 608 that inquiry into specific acts will not be allowed on cross-examination, the inherent differences between reputation and opinion evidence and the fact that effective cross-examination will reveal most defects in a witness's opinion persuade me that the best course is to adhere to the widely accepted distinction between the foundation required for reputation and opinion evidence.

*United States v. Watson*, 669 F2d 1374, 1382 (11th Cir 1982) (quoting *United States v. Lollar*, 606 F2d 587, 589 (5th Cir 1979) (citations omitted)). *See also* John B. Weinstein, 4 *Weinstein's Federal Evidence* § 608.13(2), at 608-25 (2d ed 1997) (stating that the only foundation required for lay opinions as to character is that of personal knowledge); *State v. Carsner*, 126 Idaho 911, 894 P2d 144, 150-51 (Ct App), *rev den* (Idaho 1995).

As explained in *Federal Practice and Procedure*, opinion testimony admitted under FRE 608 must be both rationally based and helpful to the trier of fact. Wright and Gold, 28 *Federal Practice and Procedure* § 6114, at 53-54 (describing the requirements of FRE 701). The requirement that the opinion be rationally based includes two components: that the "opinion * * * be based on data that is logically connected to the truthfulness or untruthfulness of the other witness * * * [and that] the opinion of the character witness * * * be based on sufficient perception of the other witness * * *." *Id.* § 6114, at 53. Although an opinion witness's perception of the substantive witness need not be contemporaneous with the trial, *see, e.g.*, Weinstein, 4 *Weinstein's Federal Evidence* § 608.13[2], at 608-25 (noting that recent information about the substantive witness is not a formal prerequisite to admission of opinion testimony), if the perception on which the opinion is based is remote from the crime and the trial, the opinion testimony may be excluded. *See, e.g.*, *Caffee*, 116 Or App at 27 (in a case in which the only recent contact consisted of letter writing, the court excluded the opinion evidence because of the lack of a current basis for the testimony). As recently explained by a federal district court, "[t]he most relevant time period [in determining the admissibility of opinion evidence] is from the date of the crime to the date of the witness testifying." *United States v. Crumby*, 895 F Supp 1354, 1364 (D Ariz 1995).[3]

---

[3] Focusing on the time period from the crime to the trial is logical whenever the credibility of the witness sought to be impeached concerns the criminal conduct. The fact that the case law does not require an opinion witness's personal knowledge of the substantive witness to be based on interaction very close to the time of trial indicates that, at least with opinion testimony, the focus is not solely on whether the witness is an honest person at the time of trial. Instead, because a witness's honesty on the stand is based on the reliability of her perception of the underlying events, a witness's credibility comprises two components: (1) whether

Here, defendant sought to introduce the testimony of several witnesses about the character for truthfulness of Jennifer and Kelly, the mothers of the two alleged victims. He also sought to introduce opinion evidence that one of the child victims, K, was untruthful. Most of the character witnesses had had contact with the state witnesses that was roughly contemporaneous with the alleged crimes. The trial court committed legal error in applying the standard for admission of reputation evidence to defendant's proffered opinion evidence.[4]

One example of the trial court's use of the wrong foundational standard is its exclusion of the opinion testimony of Jennifer's former boss, Southerton, on the ground that her knowledge of Jennifer was not "community-based" or "characteristic."[5] The majority does not address the fact that the trial court clearly used the wrong standard in excluding the former boss's testimony. It merely holds that the trial court properly held that an opinion about Jennifer's character for truthfulness could not be based on a single instance of untruthfulness. In so holding, it ignores both the

---

the witness is honest in her perception of the events at issue and (2) whether the witness tells the truth about that perception at trial. In other words, if a person's perception of the events at issue is colored by dishonesty, even if the person has somehow become an honest person by the time of trial, the portrayal of the events at the time of the crime will still be tainted by the dishonest perception. Thus, an opinion witness may testify so long as the knowledge of the substantive witness is not too remote from either the time of trial or the period during which the disputed events allegedly occurred. The point is even more obvious where, as here, the evidence at trial includes statements made by the witness at the time of the crime as well as at trial.

[1] Ordinarily, the trial court's decision to admit or exclude character witnesses under OEC 608 is reviewed for abuse of discretion. *Caffee*, 116 Or App at 27. However, because the issue of whether the trial court based its decision to exclude the evidence on the proper foundational standard is a question of law, that issue should be reviewed for errors of law. *United States v. Watson*, 669 F2d 1374, 1382-83 (11th Cir 1982). *See also State v. Reynolds*, 324 Or 550, 558, 931 P2d 94 (1997) (holding that the trial court erred as a matter of law in refusing to allow defendant to offer surrebuttal testimony as to his character for truthfulness after the state had attacked it and that that error required reversal); *United States v. Dotson*, 799 F2d 189, 193 (5th Cir 1986) (holding that the record must contain some indication that the trial court evaluated the opinion evidence according to the proper foundational standards).

[5] If opinion evidence had to be community based and characteristic in order to be admissible, it would be indistinguishable from reputation evidence, and there would have been no need to draft the evidence rules to allow the admission of opinion evidence.

efforts of other jurisdictions that have struggled with the issue and reached opposite conclusions, as well as the practical reality of how opinions are formed.

Southerton had worked with Jennifer for three weeks in 1996, the year in which the crime allegedly had occurred and been reported by Jennifer, and she had seen Jennifer on and off throughout the day during those three weeks. She fired Jennifer after discovering that she had lied in her criminal background check about whether she had any criminal convictions. The issue was important for Southerton because the business for which she employed Jennifer was a day care center for children. Further, the criminal background form that Jennifer falsely completed stated that it was important to be truthful in completing it.

As explained in federal case law and treatises, the trial court's reasons for excluding the testimony do not provide a proper basis for the exclusion of opinion evidence. Instead, as long as the opinion is rationally based on the witness's personal knowledge and would be helpful to the trier of fact, her opinion should usually be admitted and any defects in its bases be explored on cross-examination. Wright and Gold, 28 *Federal Practice and Procedure* § 6114, at 53-54; Weinstein, 4 *Weinstein's Federal Evidence* § 608.13[2], at 608-25; *Watson*, 669 F2d at 1382.

There is no indication in the record that the trial court concluded or could have properly concluded that the proffered evidence did not meet those requirements. It is clear that the opinion was rationally based on the witness's perception. First, it is beyond question that telling a lie is probative of one's truthfulness, so the opinion was rational in that sense. Second, the opinion was based on sufficient perception. Although Southerton knew Jennifer for only a brief period, she interacted with her throughout each day of that brief period, and she caught her in one overt lie. Other appellate courts have concluded that it is an error of law to exclude opinion witnesses who had similar opportunities to perceive the substantive witnesses. *See, e.g., Watson*, 669 F2d at 1382 n 6; Wright and Gold, 28 *Federal Practice and Procedure* § 6114, at 54 n 13 (citing *Honey v. People*, 713 P2d 1300, 1303 (Colo 1986); *State v. Morrison*, 351 SE2d 810 (NC App 1987)).

For example, in *Watson* the court held that it was an error of law to exclude several opinion witnesses based on insufficient perception. One of them was an employee of a public agency to which the substantive witness had made a single false complaint. Another had supervised the substantive witness for a period of two weeks. A third opinion witness had lived near the substantive witness for several years, but the opinion witness's only contact with the substantive witness apparently consisted of their working together on two or three occasions for less than an hour each. *Watson*, 669 F2d at 1382 n 6. Jennifer's former boss had more contact with the substantive witness than did the three opinion witnesses in *Watson*; it is clear that the degree of interaction between the opinion witness and Jennifer satisfies the minimal constraints of the personal knowledge requirement and that the context of the lie provided an ample basis for Southerton to form an opinion about Jennifer's character for truthfulness. Moreover, it is clear that the testimony sought to be introduced would have been helpful to the trier of fact.

The majority nonetheless concludes that the exclusion of Southerton's testimony was proper apparently because it believes that it is irrational to base an opinion as to truthfulness on one lie and because it believes that admitting the testimony would blur the distinction between opinion evidence and evidence of specific bad acts. On the contrary, there is nothing irrational about basing an opinion on a single act, especially one as probative of character for truthfulness as an overt lie made after being told the importance of truthfully reporting one's criminal background. The practical reality is that we must often make our decisions about others based on very limited information. It is unusual to catch someone in an overt lie, because lies are designed to be hidden. Therefore, catching someone in one overt lie in a short period of time logically supports an inference that the person has an untruthful character. Because the excluded evidence was rationally based and helpful to the trier of fact, the trial court did not have the authority to exclude it for lack of foundation. The proper place to explore weaknesses in the basis for the opinion, such as the length of time that Southern knew Jennifer, would have been on cross-examination.

In addition, although the majority states otherwise, admitting Southerton's testimony would in no way conflate opinion evidence with evidence of specific untruthful acts. Specific acts evidence is prohibited in most cases because of its potential prejudicial effect. The perceived danger is that the factfinder will judge the substantive witness, often the criminal defendant, based on the witness's prior acts rather than making a decision based on the evidence in the case. The drafters of the rules of evidence, both in Oregon and elsewhere, have simply decided that opinion evidence does not carry the same risk of prejudice as does evidence of prior bad acts. The majority is without power to refuse to enforce that decision, and its contention that some opinion evidence is as prejudicial as some bad acts evidence is a *non sequitur*.

I also take issue with the majority's analysis of the trial court's exclusion of the opinion witnesses who would have testified as to Kelly's character for truthfulness. The trial court excluded the opinion testimony of all four of the character witnesses whom defendant wished to use to impeach Kelly, the mother of complaining witness B. The opinion testimony of three of the witnesses was excluded because their interaction with Kelly had occurred about three years before trial, during the year that the crime allegedly had occurred and been reported by Kelly.[6] The other witness's opinion testimony was excluded based simply on a lack of foundation, without further explanation. Although remoteness from the time of trial is a basis for excluding reputation evidence, it is usually not a basis for excluding opinion evidence. *See Watson*, 669 F2d at 1381-82 & 1382 n 5; Weinstein, 4 *Weinstein's Federal Evidence* § 608.13[2], at 608-25; *Carsner*, 894 P2d at 151. The majority errs in relying on *Caffee* to conclude otherwise.

While it is possible that some interaction could be too remote from *both* the substantive witness's report of the

---

[6] The one character witness against Kelly who testified was allowed to testify only as to Kelly's reputation for truthfulness, although defendant sought to have him testify about his opinion of her character for truthfulness as well. The trial court's basis for excluding the opinion testimony was improper foundation. (The witness's reputation testimony was apparently admitted only because the state failed to object.)

alleged crime *and* the trial to permit a finding of personal knowledge, that is not the case here. Here, the character witnesses's interaction with Kelly occurred almost contemporaneously with her reports of the alleged crime and only about three years before trial.[7] The trial court apparently assumed that the only relevant reference point was the time of trial. As previously stated, the relevant period for opinion evidence extends *from* the time of the crime *to* the time of the trial. *Crumby*, 895 F Supp at 1364. Because Kelly's contact with the character witnesses occurred at about the same time as the crime *and* as the statements by Kelly about the crime that were identified or admitted at trial, I would conclude that the character witness had personal knowledge of Kelly's character during a relevant time period.[8] In excluding the opinion testimony of three of the witnesses because of its remoteness, the trial court relied on an incorrect understanding of the foundation requirements for opinion testimony. It therefore committed an error of law.[9]

Finally, I address whether exclusion of the character witnesses in this case requires reversal. To warrant reversal, an evidential error must have substantially affected the rights of a party. OEC 103(1); ORS 19.415(2). "[A]n error by the trial court substantially affects the rights of an aggrieved

---

[7] Because it is difficult to pin down the exact time lapse between the alleged crime and the witnesses' interaction with Kelly, I focus on the time lapse between Kelly's reports of the crime and her interaction with the opinion witnesses. In the indictment, the state alleged simply that the crimes against B had occurred between January 1, 1994, and September 1, 1994. Kelly's testimony at trial indicated that she and her family had moved from Oregon to Washington in August 1994 and that B had had no contact with defendant after the move. The opinion witnesses who would have testified about Kelly indicated that their interaction with her had ended when she moved. Moreover, it appears from the trial transcript that B told Kelly about defendant's alleged crimes against her at the end of September or the beginning of October 1994, and that Kelly first began to report the events to authorities toward the end of October 1994.

[8] I need not decide whether, if Kelly's testimony on the stand were her only statements that were subject to impeachment, the trial court could have excluded the character witness's opinion testimony based on its determination that a time lapse of roughly three years between the trial testimony and the contact did not meet the personal knowledge requirement.

[9] *Caffee* is the case on which the majority relies for the proposition that the foundational requirements for reputation and opinion evidence are the same, and it is the case from which Kirkpatrick extrapolates in describing the foundational requirements for opinion evidence. In fact, *Caffee* did not purport to decide the issue that we are faced with here.

party if the outcome of the case either would have or may have been different if the error had not occurred. Where such prejudice exists, the error requires reversal." *Hernandez v. Barbo Machinery Co.*, 327 Or 99, 112, 957 P2d 147 (1998) (citations omitted). As in many sexual assault cases, the state's case against defendant turned on the credibility of its witnesses. *See, e.g., State v. Reynolds*, 324 Or 550, 559 n 5, 931 P2d 94 (1997); *State v. Bairnsfather*, 591 So 2d 686, 688 (La 1991). The state offered no physical evidence of the alleged abuse. In that circumstance, the erroneous exclusion of evidence that bears on the credibility of the state's witnesses could well have affected the result in the case. The majority concludes otherwise by labeling as cumulative the evidence that it believes was erroneously excluded.

I begin with the neighbor who would have testified as to the character of K, one of the alleged child victims in the case. That witness is the only witness who would have testified as to K's character, and the majority agrees that the trial court committed error in excluding her testimony. It concludes, however, that the error was harmless. The testimony at issue concerned the credibility of one of the state's most important witnesses: one of the two alleged child victims. No other witness testified as to the child's character for truthfulness, and the entire case hinged on the credibility of witnesses; no physical evidence was offered. It follows that the exclusion of that evidence could have affected the result in the case and, therefore, that it was not harmless.

The majority goes to great lengths to portray this case as a credibility contest between defendant and Jennifer, K's mother, and to downplay the importance of K's credibility to the verdict against defendant. If the jury had not believed K, it could not have convicted defendant on the count involving her. Only one witness sought to testify as to K's character. By no stretch of the imagination could that testimony be cumulative. The defense may have proceeded on the theory that Jennifer had lied and coached K to lie. The fact that defendant chose to emphasize the possibility that Jennifer was lying and coaching K, rather than emphasizing the possibility that K was lying to Jennifer and everyone else, does not change the fact that the state had the burden to prove defendant's guilt beyond a reasonable doubt. Moreover, it

would be easier for the jury to believe that Jennifer had coached K to lie if the jury believed that *K* was someone who would lie. In this case, admissible evidence that could have materially advanced defendant's case was excluded. I would reverse defendant's conviction as to the count involving K.[10]

I now turn to the witnesses who would have testified about Kelly, the mother of B, the second alleged child victim in this case. The excluded testimony bears on count three, which named B as the victim. The crime against B allegedly occurred between January 1, 1994, and September 1, 1994. Only one witness was permitted to testify with respect to Kelly's character for truthfulness. That testimony concerned her reputation rather than the witness's opinion of Kelly's character, and, because it was admitted with very little foundation, it had only slight probative value. The court excluded the opinion testimony of four witnesses, including that of the witness who testified as to Kelly's reputation.

I focus on the excluded opinion testimony of one of the witnesses, Debra Coonradt. She would have testified that her contact with Kelly began in late May 1994 when Kelly and her family moved the bus in which they lived onto Coonradt's property, and that it continued until Kelly and her family moved away in early July. During that period, Coonradt interacted daily with Kelly and got to know her very well. The trial court excluded her opinion testimony as too remote, and the majority concludes that the court acted within its discretion in doing so. As discussed above, both analyses are based on errors of law with respect to the foundational requirements for admission of opinion evidence. Based on the short time lapse between the contact and Kelly's first reports of her daughter's accusations, and the frequency of contact between Kelly and Coonradt, I would conclude that the evidence was sufficiently probative that it could have affected the jury's decision with respect to the

---

[10] Because I would reverse as to the count involving K based on the exclusion of the witness who would have testified as to her character, there is no need for me to address whether it was harmless error to exclude the testimony of witnesses who would have to testified as to Jennifer's character for truthfulness.

count involving B. The lack of other viable character testimony about Kelly reinforces my conclusion that the admission of Coonradt's testimony could have affected the jury's decision to convict. Not only was the character evidence that was admitted with respect to Kelly of very slight probative value, it also was of a different category from the evidence at issue here. Because no similar testimony was admitted, Coonradt's testimony could not have been cumulative. Hence, I would reverse the count involving B.

Because I believe that the trial court improperly conflated the foundational requirements for reputation and opinion evidence and that its error in that regard was not harmless, I would reverse both sodomy counts. Accordingly, I respectfully dissent.