**Richard Francis HUNTER, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–10657.**

Court of Appeals of Alaska.

Aug. 16, 2013.

17. AS 33.05.070(b).

18. *Valencia*, 91 P.3d at 984.

Brooke Berens, Assistant Public Advocate, Appeals & Statewide Defense Section, Rachel Levitt, Acting Public Advocate (opening brief), and Richard Allen, Public Advocate (reply brief), Anchorage, for the Appellant.

Terisia Chleborad, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and John J. Burns, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

*OPINION*

Judge MANNHEIMER.

Richard Francis Hunter appeals his convictions for second-degree murder and tampering with evidence. At trial, the major issue was whether Hunter acted in self defense. On appeal, the question is whether the superior court committed error when, over Hunter's objection, the court allowed two police officers to testify concerning Hunter's propensity for aggression and violence.

One of these officers testified that Hunter had a reputation as a violent person. The second officer testified that, in his opinion, Hunter was an aggressive person. But as we explain in this opinion, the record (even viewed in the light most favorable to the government) does not show that the first officer met the foundational requirements for offering testimony concerning Hunter's reputation. As to the second officer, the trial judge failed to make a finding as to whether this officer's knowledge of Hunter was sufficient to allow him to offer an opinion concerning Hunter's character.

Because Hunter's claim of self-defense was the major issue litigated at Hunter's trial, we conclude that these evidentiary errors require us to reverse Hunter's conviction on the murder count.

*Underlying facts*

At Hunter's trial, the State presented the testimony of Anchorage Police Detective Pamela Perrenoud and the testimony of Anchorage Police Officer Jack Carson concerning Hunter's character for violence and aggression.

Detective Perrenoud testified that, because she was the lead investigator in the case, she looked into Hunter's background—and that, in the process of investigating Hunter's background, she learned that Hunter possessed "the tendency towards violence and aggression". Later in the trial, Officer Carson testified that, in his opinion, Hunter was "a very aggressive person".

Before the testimony of these officers was presented to the jury, the trial judge and the

attorneys discussed the admissibility of the testimony, and the prosecutor made offers of proof concerning the bases of both Perrenoud's and Carson's proposed testimony.

The prosecutor acknowledged that Detective Perrenoud had never personally encountered Hunter, and that Perrenoud's knowledge of Hunter and his character was wholly obtained through her investigation into Hunter's criminal background. According to the prosecutor's offer of proof, Perrenoud conducted this investigation by "[speaking] with a number of other law enforcement officers", and by "review[ing] a number of . . . documents prepared by law enforcement officers". The prosecutor told the court that Detective Perrenoud, through her examination of Hunter's "plethora of contacts . . . with law enforcement", either learned or inferred "that [Hunter] has a reputation as being an aggressive or violent individual in the community".

With regard to Officer Carson's opinion of Hunter's character for aggression, the prosecutor explained that Carson's opinion was based on a single encounter: One night in August 2006, Hunter was walking along the street, intoxicated, when he jumped out in front of Carson's patrol vehicle. Carson stopped his car and chased Hunter on foot. According to the prosecutor's offer of proof,

> [Carson is] trying to chase Hunter down, [and] they get into a . . . wrestling match on the ground, which culminates with Mr. Hunter grabbing Officer Carson by the testicles, and not releasing him despite being hit repeated times, until Officer Carson has to take the extreme measure of actually stomping on Mr. Hunter's head. . . .

The prosecutor told the court that, "based on that [one] contact with Mr. Hunter", Carson had "formed [the] opinion . . . that Mr. Hunter was an assaultive individual".

With respect to Perrenoud's proposed testimony, Hunter's attorney raised two objections: first, that the proposed testimony did not meet the foundational requirements of Alaska Evidence Rule 405(a), and second, that Perrenoud had no personal knowledge of Hunter's reputation.

Evidence Rule 405(a) declares that when evidence of a person's character is admissible, a litigant may prove the person's character "by testimony as to [the person's] reputation in any community or group in which the individual habitually associated", or "by testimony in the form of opinion". Hunter's attorney argued that Perrenoud's proposed testimony concerning Hunter's reputation within the law enforcement community was not admissible under Rule 405(a) because Hunter was not a member of the law enforcement community; that is, Hunter did not "habitually associate" with law enforcement officers as a group.

When the trial judge asked the prosecutor to respond to this argument, the prosecutor conceded that Hunter did not habitually associate with law enforcement officers. However, the prosecutor declared that Perrenoud's testimony would not really address Hunter's reputation within the law enforcement community. Rather, the detective's testimony would describe Hunter's reputation "in the community of Anchorage" at large—because the law enforcement officers whom Perrenoud polled (to gather her information concerning Hunter's reputation) were, themselves, members of the Anchorage general community.

In other words, the prosecutor argued that law enforcement officers were members of the community at large, and thus a person's reputation among law enforcement officers *was* the person's reputation within the community in general (even though that reputation was derived from a small sample of the community).

The trial judge decided to allow Perrenoud to testify about Hunter's reputation for aggression and violence, but not under the prosecutor's suggested rationale. Rather, the trial judge concluded that police officers could properly testify about "someone's reputation on the street"—*i.e.*, someone's reputation within the general community—because "it's a function of law enforcement", and "a necessary [component] of their jobs", to formulate opinions about the propensity of various individuals to be law-abiding or non-law-abiding.

Hunter's attorney raised a second objection to Perrenoud's proposed testimony: he argued that it was improper for Perrenoud to testify about Hunter's reputation in the community when Perrenoud's knowledge of this matter was based on "reading police reports from other officers". Responding to the defense attorney's objection, the trial judge ruled that this was a proper basis for Perrenoud to formulate her knowledge of Hunter's reputation.

With regard to Officer Carson's proposed testimony concerning his opinion that Hunter was an aggressive person, Hunter's attorney again objected on the ground that the proposed testimony did not meet the foundational requirements of Alaska Evidence Rule 405(a). Specifically, the defense attorney argued that a single meeting or encounter did not provide a legally sufficient basis for the officer to offer an opinion concerning Hunter's character under Evidence Rule 405(a). The trial judge rejected this argument, ruling that the officer's opinion was admissible even if it was based on a single instance or interaction.

Having rejected both of the defense attorney's objections, the trial judge allowed the prosecutor to present evidence of Hunter's propensity for aggression and violence through the testimony of the two officers.

*Why we conclude that Detective Perrenoud should not have been allowed to testify concerning Hunter's reputation for violence*

On appeal, Hunter renews his argument that Perrenoud should not have been permitted to testify about Hunter's reputation among the law enforcement community, since Hunter was not a member of, nor did he "habitually associate" with, the law enforcement community.

As we have just explained, when Hunter's attorney raised this objection in the trial court, the prosecutor acknowledged that Hunter was not a member of the law enforcement community, but the prosecutor attempted to circumvent this problem by asserting that Hunter's reputation among law enforcement officers was, legally speaking, the same as his reputation in the general community—since law enforcement officers are members of the community at large. On appeal, the State again argues that Perrenoud's testimony did not simply describe Hunter's reputation in the law enforcement community, but rather described Hunter's reputation in the community at large—although, this time, the State argues that the "community at large" included not only Anchorage but also Bethel and the village of Emmonak.

More specifically, the State argues that Hunter's "plethora of contacts ... with law enforcement" in Anchorage and Bethel presumably must have been based on, or initiated because of, the personal observations of police officers and citizen-witnesses. Therefore, the State argues, the existence of these police contacts creates a reasonable inference that many people in these communities believed that Hunter was aggressive and violent.

Based on this reasoning, the State asserts that when Perrenoud investigated Hunter's history of police contacts, she was simultaneously acquainting herself with Hunter's reputation for violence in the community at large—and she could therefore testify about that reputation.

■ There are two flaws in the State's argument. First, the existence of police reports concerning a person's acts of violence or aggression does not necessarily mean that the community at large views that person as a generally violent or aggressive individual. For the most part, the police are called only when there is trouble. Thus, police reports concerning an individual may not necessarily reflect that person's normal character, but rather only the instances where the person departed from their normal character.

■ The second flaw, and the more important flaw, is that the State's argument is inconsistent with the foundational requirements that had to be met if Perrenoud was to testify about Hunter's reputation.

■ As the first paragraph of the Commentary to Alaska Evidence Rule 405(a) explains, "The [required] foundation for [reputation] testimony comes in the form of establishing that the witness has sufficient

familiarity with the people in the community so that he can make a valid attempt at assessing [the person's] reputation."

The Commentary then gives a fuller explanation of what is meant by "sufficient familiarity with the people in the community"—by extensively quoting a law review article written by Dean Mason Ladd of the University of Iowa Law School, *Techniques and Theory of Character Testimony*, 24 Iowa Law Review 458, 513 (1939):

> The object of the law in [allowing reputation evidence to prove] character is to get the aggregate judgment of a community rather than the personal opinion of the witness which might be considered to be warped by his own feeling or prejudice. [This] reputation must, to be admitted, be general in a community rather than based upon a limited class. While it is not necessary that a character witness know what the majority of a neighborhood think of a person, he must know of the general regard with which the party is commonly held.
>
> . . .
>
> The requirement that the reputation be broadly general rather than that of a particular group ... again emphasizes the effort to get away from [a] secularized and consequently biased estimate of character.... The reputed character of a person is created from the slow spreading influence of community opinion[,] growing out of his behavior in the society in which he moves and is known[,] and upon this basis [reputation evidence] is accepted as proof of what his character actually is.

The foregoing description of the foundational requirements for reputation testimony suggests that Detective Perrenoud should not have been allowed to offer testimony concerning Hunter's reputation.

Perrenoud derived her knowledge of Hunter's reputation solely by reading police records and interviewing police employees. When the prosecutor made the government's offer of proof in the superior court, the prosecutor conceded that Hunter was not a member of the police community nor did Hunter habitually associate with that community. Nevertheless, the prosecutor argued that be-cause police officers are themselves members of the community at large, Hunter's reputation among police officers was tantamount to his reputation in the community at large.

But as the above-quoted commentary explains, when a party offers a witness to testify about a person's reputation in a specified community, that witness must know of the reputation that is "broadly" or "general[ly]" held in that specified community, rather than the reputation that the person has among "a particular group" within that community. This foundational requirement would seem to be most important when the "particular group"—here, the law enforcement segment of the community—encounters the person only under particular circumstances, or only upon the occurrence of a particular kind of event.

This is not to say that police officers are uniformly precluded from offering evidence of a person's reputation within a community. As the trial judge in Hunter's case recognized, a police officer whose duty is to patrol a community, and who therefore engages in a large number of conversations and interactions with members of that community, might well have sufficient knowledge of the community reputation of various individuals to offer testimony on that point.

The prosecutor at Hunter's trial asserted that Detective Perrenoud investigated Hunter's reputation, not only by "review[ing] a number of ... documents prepared by law enforcement officers", but also by "[speaking] with a number of other law enforcement officers". Because Perrenoud apparently polled "a number of other ... officers", it is conceivable that Perrenoud spoke to one or more officers who, themselves, would have been qualified to offer testimony concerning Hunter's reputation in the community.

█ But a witness does not become qualified to offer testimony concerning a person's reputation simply by interviewing *other* people who, themselves, would be qualified to offer testimony on this subject.

As *Wigmore* explains, the rule at common law was that character witnesses had to reside in the community where the person's

reputation was developed. Witnesses did not become qualified to testify about a person's reputation "by a mere visit of inquiry, or by a casual sojourn, or by a conversation with a resident who [was acquainted with] the reputation".[1]

*Wigmore* suggests, however, that this common-law rule is nowadays "too strict", because it is now possible to conduct "organized investigation and research" into people's attitudes and beliefs.[2] Given modern polling and research techniques, *Wigmore* declares that "[s]ystematic inquiry by a person coming from outside will often be a better source of knowledge than the casual opportunities of a neighbor or a friend [to gain knowledge of a person's reputation]."[3]

One court decision embodying *Wigmore's* suggested approach is *State v. Cross*, 343 S.W.2d 20 (Mo.1961). The Missouri court endorsed the general rule that "[a] person possessing [an] acquaintance with the general reputation of the [person] in the neighborhood or among the people with whom the [person] associates ... may testify concerning [that] reputation."[4] The court then added that, at least potentially, a reputation witness would not need to personally be a member of the same community:

> [We do] not hold that a stranger-investigator may never, under any circumstances, acquire the necessary testimonial qualifications on the ... issue of [a person's] reputation. On the contrary, we are of the view that an investigation and inquiry made for the specific purpose of discovering [a person's] reputation ... may extend over a sufficient time, be broad enough in scope, and be otherwise conducted in such a manner as to enable the investigator reasonably to arrive at a probatively valuable conclusion as to the manner in which [the] community regards [that person].

*Cross*, 343 S.W.2d at 24.

■ However, even under this more relaxed, modern rule, courts should not admit reputation testimony from witnesses like Detective Perrenoud—because, as *Wigmore* cautions, courts should not allow an outside inquirer to testify about a person's reputation "when the inquirer is a paid partisan agent who seeks evidence for one purpose only".[5]

Detective Perrenoud was obviously a "paid partisan agent" of the State. And the way that Perrenoud conducted her investigation—*i.e.*, her decision to research Hunter's reputation solely by examining police records and interviewing police officers—indicates that Perrenoud "[sought the] evidence for one purpose only". Perrenoud could reasonably foresee that her sources were likely to provide accounts of Hunter's worst behavior, and were unlikely to provide accounts of Hunter's acts of peacefulness or law-abidingness.

The danger of allowing witnesses like Detective Perrenoud to testify about a person's character was explained by an English court more than two centuries ago. Here is what Lord Chief Justice Kenyon said in *Mawson v. Hartsink*, 4 Espinasse's Nisi Prius Reports 102 (1802):[6]

> If this was allowed, when[ever] it was known that a [particular] witness was likely to be called, it would be possible for the opposite party to send round to persons who had prejudices against [the witness] and from thence to form an opinion ... which ... afterwards [would] be told in court to destroy his credit.

This appears to be what happened in Hunter's case.

But despite this warning from so long ago, courts still encounter modern variants of this practice. For example, in *Hernandez v. State*, 800 S.W.2d 523 (Tex.Crim.App.1990), the prosecution called two witnesses—a deputy constable and a justice of the peace—to testify about the defendant's bad reputation

---

1. John Henry Wigmore, *Evidence in Trials at Common Law* (Chadbourn revision, 1970), § 692, Vol. 3, pp. 20–21.

2. *Id.*, § 692, Vol. 3, p. 22.

3. *Ibid.*

4. *Cross*, 343 S.W.2d at 23.

5. *Ibid.*

6. Quoted in *Wigmore*, § 692, Vol. 3, p. 21.

with regard to peacefulness and law-abiding-ness. These two witnesses had no personal knowledge of the defendant's reputation in the community. Rather, they claimed to have knowledge of the defendant's reputation by virtue of their acquaintance with past police investigations, and their receipt of complaints concerning the defendant's prior acts of public intoxication and disorderly conduct.[7]

The Texas Court of Criminal Appeals concluded that these two witnesses should not have been allowed to testify. The court explained that

[t]he trustworthiness of reputation testimony stems from the fact that a person is observed in his day[-]to[-]day activities by other members of the community[,] and these observations are discussed [within the community]. Over a period [of] time[,] there is a synthesis of these observations and discussions which results in ... the individual's reputation. [But when testimony about] reputation is based solely on specific [reported] acts, this synthesis is lost, as well as its reliability.

. . .

Substantial familiarity with specific acts is not the same as substantial familiarity with reputation.

*Hernandez*, 800 S.W.2d at 524.

Because the two witnesses in *Hernandez* did not directly ask community members about Hernandez's reputation, but simply inferred that Hernandez must have a bad reputation based on their prior investigations (as public officials) and their discussions with community members concerning Hernandez's prior bad acts, the Texas Court of Criminal Appeals held that "the witnesses were not competent to testify as to [Hernandez's] reputation."[8]

*See also People v. Bingham,* 75 Ill.App.3d 418, 31 Ill.Dec. 228, 394 N.E.2d 430, 437 (1979) ("Community reputation testimony about a person must be based upon a witness's knowledge [of that reputation] through association and contact with the person's friends and neighbors."); *Commonwealth v.*

*United Food Corp.,* 374 Mass. 765, 374 N.E.2d 1331, 1336 (1978) ("We agree that evidence of specific events, statements, or opinions may not be used to prove reputation[.]"); *Commonwealth v. Pilosky,* 239 Pa.Super. 233, 362 A.2d 253, 256 (1976) (holding that the trial judge properly refused to admit the testimony of a private investigator who was hired by the defense to investigate the victim's character: "There was no [evidence] ... that [the investigator] could testify to [a] familiarity with or personal knowledge of the victim's repute.").

The evidentiary foundation that the Texas court declared to be inadequate in *Hernandez* is essentially the same foundation that the State offered for Detective Perrenoud's testimony in Hunter's case. The prosecutor did not claim that Perrenoud's knowledge of Hunter's reputation stemmed from her long-standing residence in, or longstanding association with, the community in which Hunter resided. Rather, the prosecutor declared that Perrenoud's knowledge of Hunter's reputation was based on her examination of police files, and on her interviews with police officers.

As we explained earlier, it is conceivable that one or more of the police officers that Perrenoud interviewed might have had sufficient personal knowledge of Hunter's reputation in the community to testify about that reputation. As the trial judge noted, police work often requires officers to associate themselves closely with a community for a substantial period of time. As a result of this longstanding association, an officer might acquire knowledge of various individuals' reputation within the general community, and might become qualified to testify concerning those individuals' reputation.

But Detective Perrenoud did not have sufficient knowledge of Hunter's reputation within the community—even if we view the prosecutor's offer of proof in the light most favorable to the State. Accordingly, we conclude that it was error for the trial judge to allow Perrenoud to testify concerning Hunter's reputation for aggression and violence.

---

7. *Hernandez,* 800 S.W.2d at 524.

8. *Hernandez,* 800 S.W.2d at 525.

*Officer Carson's testimony that, in his opinion, Hunter was an aggressive person*

On appeal, Hunter renews his argument that Officer Carson should not have been allowed to give his opinion of Hunter's character for aggression because Carson's opinion was based on a single episode—a single interaction between the officer and Hunter. In support of this argument, Hunter cites decisions from other states in which appellate courts upheld trial court rulings that a single incident or interaction was not a sufficient basis for a witness to offer an opinion concerning another person's character.[9]

But in these instances, the appellate courts did not hold that a single incident or interaction could *never* be a sufficient basis to offer opinion testimony concerning a person's character. Rather, these appellate courts upheld rulings by trial judges that the *particular* incident or interaction offered in those cases did not furnish the witness with a sufficient basis for evaluating the other person's character.

■ When a witness proposes to offer an opinion concerning another person's trait of character, the law requires a foundational showing that the witness personally knows the other person well enough to have formed a reliable opinion concerning the particular character trait at issue.[10] As a practical matter, this foundational showing will hinge on several factors—primarily, the nature of the relationship between the witness and the other person, the length and recency of that relationship, and the frequency and nature of their contacts.

Even a short acquaintance could conceivably form an adequate basis for an opinion regarding another person's character, if that short acquaintance were marked by striking occurrences or interactions which clearly demonstrate the character trait at issue.[11]

But in making this assessment, a trial judge must bear in mind that the ultimate inquiry is the witness's ability to meaningfully judge the other person's *character*.

■ In this context, "character" means a "generalized description of [a person's] disposition in respect to a general trait such as honesty, temperance, or peacefulness"—"a person's tendency to act [in a particular manner] in all the varying situations of life". Commentary to Alaska Evidence Rule 406, first paragraph. Thus, a person's underlying *character* for truthfulness or untruthfulness, or a person's underlying *character* for peacefulness or violence, must be distinguished from the person's individual acts that demonstrate truthfulness or untruthfulness, or that demonstrate peacefulness or violence.

A witness who has observed another person act peacefully or violently in the past may still not know enough about the person to offer a meaningful opinion concerning the person's underlying character for peacefulness or violence. As the Oregon Court of Appeals has noted, "To hold otherwise would mean that the distinction between character traits and individual misdeeds would be obliterated."[12] On the other hand, it is at least conceivable that a single act might convincingly reveal a person's character.

Here, the State offered proof of an interaction between Hunter and Officer Carson that some people might consider sufficiently striking as to be illustrative of Hunter's underlying character. However, when the trial judge made his ruling as to whether Carson could offer an opinion about Hunter's character for aggression based on this single encounter, the trial judge did not undertake the kind of analysis we have just described. Rather, the trial judge declared that if Carson had, indeed, formed an opinion about Hunter's character based on this single epi-

9.  *State v. Irby*, 368 N.W.2d 19, 23 (Minn.App. 1985); *State v. Maxwell*, 172 Or.App. 142, 18 P.3d 438, 444–45 (2001).

10.  *See* Edward J. Imwinkelried *et alia, Courtroom Criminal Evidence* (4th edition, 2005), § 804, Vol. 1, pp. 342–43; Edward J. Imwinkelried and Daniel D. Blinka, *Criminal Evidentiary Foundations* (1997), chapter 6(b), p. 200; Clifford S. Fishman and Anne T. McKenna, *Jones on Evidence* (7th edition, 1998), § 16:22, Vol. 3, pp. 150–51.

11.  *See United States v. Watson*, 669 F.2d 1374, 1382 (11th Cir.1982); *United States v. Lollar*, 606 F.2d 587, 589 (5th Cir.1979).

12.  *State v. Maxwell*, 172 Or.App. 142, 18 P.3d 438, 445 (2001).

sode, then Carson should be permitted to express that opinion—because Evidence Rule 405(a) allows opinion evidence concerning a person's character. The judge added that it was up to Hunter's attorney to cross-examine Carson if he wished to show that Carson's opinion was unsubstantiated or based on inadequate information.

■ This was an abrogation of the judge's gate-keeping function. While Officer Carson may have subjectively formed an opinion about Hunter's character based on their one interaction, the trial judge was still required to determine, as a foundational matter, whether this single act of violence was sufficient to allow Carson to meaningfully evaluate Hunter's underlying character for aggression—Hunter's "tendency to act [with aggression] in all the varying situations of life".

Because the trial judge did not reach this foundational question, we are unable to determine whether Carson should have been permitted to give the challenged testimony. However, we need not address this matter further—because we conclude that even if Carson's testimony was proper, the erroneous admission of Detective Perrenoud's testimony concerning Hunter's reputation for violence and aggression requires reversal of Hunter's murder conviction.

*Why we conclude that the erroneous admission of Perrenoud's testimony requires reversal of Hunter's murder conviction*

■ The central issues litigated at trial were (1) whether Hunter acted in self-defense and, if so, (2) whether the amount of force that Hunter used was reasonable. Hunter took the stand and testified that he used deadly force against the deceased because the deceased would not let Hunter out of his vehicle, and because the deceased attacked Hunter with a utility knife. Aside from Hunter's testimony, the jury had limited information about what happened inside the vehicle. In this context, the jury was likely to give substantial weight to the testimony of the lead investigator, Detective

Perrenoud, that Hunter was known for possessing "the tendency towards violence and aggression".

We acknowledge that the jury also heard Officer Carson's testimony that, in his opinion, Hunter was "a very aggressive person". But the impact of that testimony was mitigated because the jury was told that Carson's opinion was based on a single (unspecified) incident. And only Detective Perrenoud expressly informed the jury that Hunter was known for his propensity for violence.

We conclude that there is a substantial likelihood that Perrenoud's testimony appreciably affected the jury's decision on the murder charge, and we accordingly order a new trial on that charge.[13]

*Whether the erroneous admission of Perrenoud's testimony requires reversal of Hunter's evidence-tampering conviction*

In addition to his conviction for second-degree murder, Hunter was also convicted of evidence-tampering. The State alleged that Hunter committed this crime when, following the homicide, Hunter threw his blood-covered jacket into the trash outside the Alano Club.

In his brief to this Court, Hunter argues that the error in admitting the reputation evidence requires the reversal of both of his convictions, but he does not explain how the error in admitting the reputation testimony might have affected the jury's verdict with respect to the evidence-tampering charge. The State likewise does not address this issue in its brief.

Although Hunter's reputation for violence and aggression would seem to have little relevance to the evidence-tampering charge, we hesitate to decide this issue in the absence of meaningful briefing. Because our reversal of Hunter's murder conviction means that we must return Hunter's case to the superior court, we conclude that it would be better for Hunter to present whatever

---

**13.** *See Love v. State,* 457 P.2d 622, 634 (Alaska 1969) (holding that the test for the harmlessness of non-constitutional error is whether the appel-late court "can fairly say that the error did not appreciably affect the jury's verdict").

argument he may have on this point to the superior court.[14]

charge because of the improper admission of the reputation evidence.

*Conclusion*

Hunter's conviction for second-degree murder is REVERSED. The superior court shall decide whether Hunter is also entitled to a new trial on the evidence-tampering

**14.** *See, e.g., Johnson v. State*, 268 P.3d 362, 369 (Alaska App.2012).