MODIFIED OPINION[1]

NOT DESIGNATED FOR PUBLICATION

No. 120,398

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

SCOTT R. BOLLIG,
*Appellant*.

MEMORANDUM OPINION

Appeal from Trego District Court; GLENN R. BRAUN, judge. Original opinion filed February 21, 2020; modified opinion filed June 29, 2020. Reversed and remanded with directions.

*Daniel C. Walter*, of Walter & Walter, LLC, of Norton, for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., MALONE and ATCHESON, JJ.

ATCHESON, J.: This court issued an opinion on February 21, 2020, remanding this case to the Trego County District Court for an evidentiary hearing on Defendant Scott Robert Bollig's motion for a new trial. The State timely filed a motion for rehearing or modification. Bollig did not file a response. We have considered the State's motion and find no reason to change the result we originally reached. We have, however, elaborated

---

[1]REPORTER'S NOTE: Opinion No. 120,398 was modified by the Court of Appeals on June 29, 2020, in response to the State's motion for rehearing or modification.

1

on the legal bases for our ruling in light of points the State has raised. Apart from the additional explanation, this modified opinion closely tracks our February 21 opinion. We originally decided this appeal on the briefs and have concluded oral argument would not now be of material assistance.[*]

[*]The panel for the February 21 opinion include Judge G. Joseph Pierron. Upon Judge Pierron's retirement, Judge Thomas E. Malone was added to the panel and has participated fully in ruling on the State's motion for reconsideration and the issuance of this modified opinion.

A jury sitting in Trego County District Court in late 2015 convicted Bollig of conspiracy to commit murder for plotting to cause his pregnant girlfriend to miscarry. Terry Eberle, then the WaKeeney police chief, participated in the criminal investigation and testified as a State's witness in pretrial hearings and the trial. In May 2017, the Trego County Attorney charged Eberle with multiple felonies at least some of which entailed malfeasance as police chief. About four months later, the county attorney informed Bollig's lawyer that Eberle had acknowledged giving false testimony in this case. Armed with that information, Bollig's lawyer filed a motion for a new trial under K.S.A. 2019 Supp. 22-3501(1).

After a nonevidentiary hearing on the new trial motion in November 2018, the district court filed a short journal entry denying Bollig any relief. On Bollig's appeal, we find the district court took too narrow a view of Eberle's misconduct and should have held an evidentiary hearing. In addition, the district court's findings are so terse we would be hard pressed to make a meaningful appellate review of them. We, therefore, reverse the district court's ruling denying the motion for a new trial and remand for further proceedings, including an evidentiary hearing.

2

In explaining our decision, we dispense with a detailed discussion of the facts underlying Bollig's prosecution—they are convoluted and largely extraneous to our determination that the district court acted prematurely in denying the new trial motion. The parties, of course, are familiar with the circumstances, and we captured an overview in ruling on Bollig's earlier appeals in this case. See *State v. Bollig*, No. 115,408, 2018 WL 1976689 (Kan. App. 2018) (unpublished opinion) (affirming in part and remanding in part for further consideration of suppression issue); (*Bollig I*); *State v. Bollig*, No. 115,408, 2018 WL 3945934 (Kan. App. 2018) (unpublished opinion) (affirming denial of motion to suppress following remand) (*Bollig II*).

The State's evidence against Bollig showed that he secretly placed an abortifacient in his girlfriend's food. She miscarried several days later. The girlfriend testified at trial that Bollig had confessed to her after her miscarriage. Bollig testified in his own defense and told the jury he had obtained Mifepristone and Misoprostol, drugs administered sequentially as a common form of medication abortion, at his girlfriend's request and she took the Mifepristone herself. Bollig's account didn't mesh well with other evidence and imputed a peculiar course of conduct to his girlfriend in light of that evidence. See *Bollig I*, 2018 WL 1976689, at *9-10. He said he never confessed to giving the drug to his girlfriend without her knowledge.

Eberle and Kevin Campbell, an agent with the Kansas Bureau of Investigation, interviewed Bollig at the WaKeeney Police Department on consecutive days about three weeks after Bollig's girlfriend miscarried. Toward the end of the first meeting, Bollig signed consents to search his smartphone and personal computer and turned those devices over to the officers. In a suppression hearing, Bollig testified that he signed the consents because he was told he could have his smartphone back the next day and was promised nothing would happen to him if he cooperated with the investigators. Eberle testified that

3

no threats or promises had been made to Bollig and he knowingly and voluntarily signed the consents. In deciding the suppression against Bollig, the district court specifically credited Eberle's version of the meeting and discounted Bollig's. See *Bollig II*, 2018 WL 3945934, at *1.

A search of the smartphone yielded a series of text messages between Bollig and a nurse with whom he had an ongoing intimate relationship. They discussed drugs that could be used to induce Bollig's girlfriend to miscarry and how she might be tricked into taking them. Those text messages established the conspiracy and were critical to the State's case on that charge.[1]

[1]The State also charged Bollig with intentional first-degree murder for the miscarriage of his girlfriend's fetus. See K.S.A. 2019 Supp. 21-5419 ("unborn child" within definition of "person" as used in statutes criminalizing various degrees of homicide, including first-degree murder). The jury returned a not guilty verdict on the murder charge, a result that can be reconciled with the conspiracy conviction in light of the evidence. See *Bollig I*, 2018 WL 1976689, at *10, n.2.

The day after he turned over his smartphone and computer and signed the consents to search, Bollig returned to the police station and was again questioned by Eberle and Campbell. Eberle testified at trial that Bollig admitted making breakfast for his girlfriend one morning and lacing her pancakes with Mifepristone. At trial, Bollig denied making any such statement to Eberle and Campbell.

After Eberle was criminally charged, he entered into a diversion agreement to resolve the case against him. Bollig's lawyer obtained a copy of the diversion agreement, and it was presented to the district court in support of his motion for a new trial. Eberle's diversion agreement basically required him to be law abiding for five years (through February 2023), and if he succeeded, the State would dismiss the charges against him with prejudice. Eberle also agreed not to run for public office or to seek employment as a law enforcement officer during the term of the diversion agreement.

4

As is common, Eberle's diversion agreement contains a fairly detailed factual statement to which he stipulated; and Eberle acknowledged that if he violated the agreement, the stipulation would be used as the exclusive evidence in the renewed criminal prosecution of him. We do not set out the stipulated facts at length here. The stipulation recites Eberle's testimony at Bollig's preliminary hearing that he did not use video equipment available in the police station to record the two interviews with Bollig and that he had never recorded anybody. During Bollig's trial, Eberle reiterated that the interviews had not been recorded, and he told the jurors he wasn't familiar with the video recording equipment. The stipulation states that Eberle later admitted to a KBI agent that he had recorded interviews of suspects before Bollig's preliminary hearing and trial. In the diversion agreement, Eberle further stipulated that he "intentionally and falsely testified to a material fact . . . during the BOLLIG trial in 2014 and 2015" in that respect.

After receiving Bollig's motion for a new trial and the associated exhibits, including Eberle's diversion agreement, the district court held what it characterized as a "preliminary inquiry" to determine if an evidentiary hearing would be required to decide the motion. Lawyers for the State and Bollig made arguments to the district court but offered no additional evidence in keeping with the limited scope of the hearing. The district court filed a short journal entry about three weeks later denying Bollig's new trial motion. The district court recognized Eberle's diversion agreement and the admissions it contained constituted new evidence under K.S.A. 2019 Supp. 22-3501(1) with respect to Bollig's prosecution. But the district court concluded without any real explanation that the new evidence—presumably meaning the specific stipulations in Eberle's diversion agreement—would not have changed either the outcome of the jury trial or its ruling on the earlier motion to suppress.

Bollig has appealed the denial of his motion for a new trial.

*Standards Governing New Trial Motions*

As provided in K.S.A. 2019 Supp. 22-3501(1), a district court may grant a criminal defendant a new trial "if required in the interest of justice." The statute specifically allows a defendant to seek relief within two years of a final judgment based on newly discovered evidence. Nobody disputes the timeliness of Bollig's motion nor suggests some other procedural obstacle to our consideration of the district court's ruling.

Despite the broad charge in K.S.A. 2019 Supp. 22-3501(1), courts view motions for new trials based on new evidence with disfavor. *State v. Moncla*, 269 Kan. 61, 64, 4 P.3d 618 (2000); *State v. Krider*, 41 Kan. App. 2d 368, 384, 202 P.3d 722 (2009). Courts generally ascribe an assumption of regularity to a jury trial and the resulting verdict—that witnesses take the oath seriously and endeavor to tell the truth as they know it and jurors diligently apply the law they are given to the facts they find to render a true verdict. Newly discovered evidence challenging that assumption often entails an assertion from a reluctant State's witness subpoenaed to testify at trial that he or she did so falsely. And the recanting witness is sometimes a friend, relative, or other associate of the defendant. Recanting witnesses tend to be viewed with skepticism, again on the assumption their trial testimony ought to be accepted absent compelling contrary reasons. See *State v. Norman*, 232 Kan. 102, 109, 652 P.2d 683 (1982); *State v. Lewis*, 33 Kan. App. 2d 634, 651, 111 P.3d 636 (2003).

An appellate court reviews the ruling on a motion for a new trial for abuse of discretion. *State v. Phillips*, 309 Kan. 475, 477, 437 P.3d 961 (2019). A district court oversteps that discretion if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural*

*Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

*District Court Erred in Denying Bollig an Evidentiary Hearing*

Here, the district court applied too narrow a legal framework in denying the motion without an evidentiary hearing and, thus, abused its discretion. A district court should look at an array of factors in determining the need for an evidentiary hearing:

> "'(1) whether the motion alleges facts which do not appear in the original record which, if true, would entitle [the movant] to relief; (2) whether the motion adequately identifies readily available witnesses whose testimony would support these new facts and demonstrate that [the movant] should receive a new trial; and (3) whether [the movant's] newly discovered evidence could have been produced at trial through the exercise of reasonable diligence.'" *Beauclair v. State*, 308 Kan. 284, 296, 419 P.3d 1180 (2018) (quoting *Moncla*, 285 Kan. at 840).

Bollig's motion considered with the stipulation in Eberle's diversion agreement was consistent with those factors and favored an evidentiary hearing. As the district court found, Eberle's admissions of perjury appeared nowhere in the original record of Bollig's prosecution and they could not have been readily discovered leading up to or during Bollig's trial. The new trial motion plainly identified witnesses (Eberle and the KBI agent who questioned him, at the very least) who would support the requested relief.

Under the circumstances, Eberle's admission that he gave perjured testimony in Bollig's prosecution, including during the jury trial, was never seriously disputed. That seems more than reasonable. The State prosecuted Eberle for lying under oath and couldn't very well argue his admissions to doing so were credible for that purpose but should have been rejected as of doubtful credibility in considering Bollig's new trial motion. And Eberle's admitted dereliction of duty as a sworn law enforcement officer

7

placed him in a position markedly different from most recanting witnesses. The critical question in deciding Bollig's new trial motion was not whether Eberle provided perjured testimony but the extent of his perjury. Nothing in the diversion agreement suggests the perjurious statements identified there necessarily constituted the universe of Eberle's false testimony. The district court cut off Bollig's ability to answer the critical question by denying his motion without an evidentiary hearing.

At the very least, Bollig should have been given the opportunity to subpoena and produce Eberle for an evidentiary hearing and then to examine him about the extent of the false statements he made in testifying as a State's witness in this case. The law enforcement agents investigating Eberle's perjury would, likewise, be potential witnesses at the hearing. In short, Bollig ought to be able to explore the breadth of Eberle's perjurious testimony in this case and, within reasonable limits, his perjurious testimony in other cases. If Eberle serially lied in criminal prosecutions, that pattern would tend to bolster an inference his perjurious testimony against Bollig may have exceeded what he admitted to in the diversion agreement. And it would constitute a particular form of bias or prejudice tending to impeach Eberle's testimony in criminal cases.

*Eberle's Acts of Perjury Admissible to Show Corrupt Motive and Bias or Prejudice*

In its motion for reconsideration, the State contends that Eberle's admitted perjury and any other demonstrable instances of perjury he might have committed in this case are inadmissible character evidence and, therefore, could not have affected the outcome of the suppression hearing or the jury trial. The State further says any perjurious testimony Eberle might have given in other criminal cases would be similarly inadmissible. The argument, however, takes too restrictive a view of the rules of evidence. A witness' particular willingness to lie under oath entails a corrupt motive cutting to the heart of the adjudicatory process and entails a much narrower form of impeachment than proof of a general character trait for dishonesty. The impeachment here lies in Eberle's corrupt

8

motive to commit perjury, especially as a government agent and a State's witness in criminal prosecutions, rather than in his general character. We explain why the rules limiting general character evidence do not govern impeachment through proof of a witness' corrupt motive to commit perjury—a narrower and quite arguably more pernicious form of bias or prejudice.

Evidence of a witness' general character trait for "honesty or veracity or their opposites" may be admitted to attack his or her credibility. K.S.A. 60-422(c). The character trait may be proved through evidence of the witness' reputation, another witness' opinion, or conviction of a crime of "dishonesty or false statement." K.S.A. 60-420 (reputation or opinion); K.S.A. 60-421 (criminal conviction). But evidence of specific instances of the witness' conduct on specific occasions may not be admitted as evidence of character. K.S.A. 60-422(d).

A person's character for honesty or its opposite rests on his or her disposition to be truthful or untruthful in the broad circumstances of life, including business and personal pursuits. It is, then, a general attitude or manner of comportment. See *Hunter v. State*, 307 P.3d 8, 16 (Alaska App. 2013); *Birkhamshaw v. Socha*, 156 Conn. App. 453, 471-72, 115 A.3d 1 (2015). So if a person generally behaves honestly or dishonestly, that is some circumstantial evidence he or she has behaved in a consistent fashion as a witness testifying in court. 1 McCormick on Evidence § 195 (8th ed.) ("Character is a generalized description of a person's disposition, or of the disposition in respect to a general trait, such as honesty, temperance or peacefulness, that usually is regarded as meriting approval or disapproval."). Like other generalities, however, that evidence chain isn't necessarily a strong one. The facts of a given case may cause an otherwise truthful person to deliberately shade his or her testimony to favor one party or the other—the textbook example being a mother offering a false alibi for her ne'er-do-well child. *Houston v. State*, No. 02-17-00025-CR, 2018 WL 1095541, at *6 & n.4 (Tex. App. 2018) (unpublished opinion); Gershman, "The Prosecutor's Duty to Truth," 14 Geo. J. Legal

9

Ethics 309, 339 n.174 (2001) ("Where a defendant presents his mother as his alibi witness, a prosecutor need only ask one question: 'Would you lie for your son?'"); cf. *Battle v. State*, 269 So.3d 325, 329 & n.4 (Miss. App. 2018). Conversely, a person with only a passing concern for the truth in quotidian undertakings might be sufficiently awed by the solemnity of the oath administered at the witness stand to strive for honesty while testifying. See *State v. Franco*, 49 Kan. App. 2d 924, 936, 319 P.3d 551 (2014); *In re L.M.H.*, No. 108,297, 2013 WL 2395900, at *13 (Kan. App. 2013) ("[T]he principal mechanisms for measuring the candor and reliability of a witness [are]: (1) the taking of an oath to tell the truth; (2) the rigor of cross-examination to test the statements; and (3) the fact-finder's opportunity to gauge demeanor.").

The exclusion of specific instance evidence as a means of proving the general character trait for honesty or its opposite reflects practical trial considerations and the relative weakness of the character trait, once proved, as an indicator of truthful or untruthful testimony. The limitation is not rooted in some inherent unreliability of the specific instance evidence itself. But, rather, a single instance standing alone easily could be discounted as significant proof of character. Even characteristically truthful people sometimes tell lies, and conversely liars may tell the truth from time to time.

Rules of evidence have for the most part precluded the use of specific instances to prove general character for honesty or, more commonly, dishonesty as a bow to practicality. First, the party attacking the witness would be disposed to offer multiple instances of the witness making false statements, i.e., lying. The circumstances of those lies usually would be collateral to the issues being tried. And the witness might very well dispute some or all of those circumstances, causing the proceedings to devolve into mini-trials over them and diverting the jurors of their central mission. On balance, the limited usefulness of general character evidence in assessing veracity doesn't justify the distraction proof by specific instance would inject into a hearing or trial. *State v.*

10

*Guenther*, 181 N.J. 129, 141-42, 854 A.2d 308 (2004); 1 McCormick on Evidence § 188 (8th ed.).

Impeaching witnesses with their convictions for crimes of dishonesty—a form of specific instance evidence—largely eliminates those digressions. The impeaching party presumably will rely on an attested copy of a judgment of conviction establishing the crime and the witness' identity as the criminal. See K.S.A. 2019 Supp. 60-460(r) (judgment of conviction not excluded as hearsay when offered to prove any essential fact); K.S.A. 2019 Supp. 60-465 (admissibility of attested copies of "official record"). And typically the impeaching or dishonest nature of the crime will be apparent, e.g., theft or making a false writing. See K.S.A. 2019 Supp. 21-5801 (theft); K.S.A. 2019 Supp. 21-5824 (making false information). Impeachment by criminal conviction is, thus, essentially self-contained, quite linear, and seldom open to serious dispute. *Guenther*, 181 N.J. at 142.

The Kansas evidentiary rules governing the proof of character evidence for witness impeachment do not permit the use of specific instances of honesty or dishonesty for that purpose, except for a conviction of a crime of dishonesty. Eberle's admissions of perjury and the statements in his diversion agreement could not be used to impeach him by showing he has a general character trait of dishonesty. The flaw in the State's position doesn't lie so much in its analysis of the law on character evidence; it lies in confining the argument to that mode of impeachment.

The credibility of witnesses testifying during a hearing or at trial is always relevant. And a witness' credibility may be challenged in different ways, including but not limited to his or her general character trait for honesty or its opposite. For example, a witness may not have been in a position to see clearly what he or she has recounted while testifying. Or the witness may have difficulty remembering what he or she did see. Those are problems of perception and recollection that may call into question the accuracy of

11

the factual rendition, although they do not particularly suggest mendacity. An honest witness may, nonetheless, be a mistaken witness. More to the point here, a witness may have a bias, prejudice, or some interest in the outcome of the case or be given to another form of partiality that could shade his or her testimony. *State v. Ross*, 280 Kan. 878, 886, 127 P.3d 249 (2006) ("'"[P]roof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."'" [quoting *State v. Knighten*, 260 Kan. 47, 54, 917 P.2d 1324 (1996)]); *Lindquist v. Ayerst Laboratories, Inc.*, 227 Kan. 308, 315, 607 P.2d 1339 (1980) ("[E]vidence of bias or prejudice of a witness is relevant and may be shown on cross-examination or in rebuttal or by other witnesses or evidence."); *State v. Scott*, 39 Kan. App. 2d 49, 56, 177 P.3d 972 (2008) ("One of the methods or techniques for attacking the credibility of a witness is to show partiality, including bias, motive, and interest in the outcome.").

The overarching objective of the rules of evidence is to present a fact-finder with all relevant evidence absent an explicit exclusion. K.S.A. 60-407(f). Typically, evidence relevant and admissible for one purpose but not for another should be admitted, subject to an appropriate limiting instruction if requested by the disadvantaged party. K.S.A. 60-406; *State v. Araujo*, 285 Kan. 214, 221, 169 P.3d 1123 (2007). So evidence that would be inadmissible to prove a general character trait of the witness may be admitted if it would otherwise be relevant either as bearing on the witness' credibility or for some other purpose. See *United States v. Figueroa*, 548 F.3d 222, 229-30 (2d Cir. 2008); Fed. R. Evid. 608, Advisory Committee Notes to 2003 Amendments (proof of specific instances of witness' untruthfulness may be considered for impeachment on grounds other than character, such as bias).

In the context of a testifying witness, bias or prejudice is commonly thought of as a reason that person would have to skew his or her account to favor one party (bias) or to discredit the other (prejudice) based on some individualized like or dislike of that party.

But a corrupt motive or reason for giving false testimony need not be so personalized or narrow to evince an impeachable bias or prejudice. *Longus v. United States*, 52 A.3d 836, 850 (D.C. App. 2012) (bias includes witness' personal disposition for or against a party and any distinct motive to lie); Wright & Miller, 27 Federal Practice and Procedure: Evidence § 6095 (2d ed.) (recognizing John H. Wigmore's inclusion of witness corruption as form of bias). The demonstrable willingness of a government agent to provide knowingly false testimony to advantage the prosecution in a criminal case entails a form of bias distinct from the general character trait for honesty or its opposite. See *Johnson v. Brewer*, 521 F.2d 556, 563 (8th Cir. 1975); *Morgan v. State*, 54 P.3d 332, 335-36 (Alaska App. 2002) (acknowledging admissibility of witness' "corruption," including the willingness to give false testimony or an admission to having given false testimony, as a form of bias or interest bearing on credibility); *Bennett v. State*, 307 Ark. 400, 404, 821 S.W.2d 13 (1991) (undercover officer's perjured testimony called into question veracity of other inculpatory testimony, requiring new trial); *Longus*, 52 A.3d at 853-54 (trial court improperly restricted examination of police officer for bias based on "corruption" entailing "'a willingness to obstruct the discovery of the truth by manufacturing or suppressing testimony'") (quoting *In re C.B.N.*, 499 A.2d 1215, 1219 [D.C. App. 1985]); cf. *People v. Bell*, 74 Mich. App. 270, 284-85, 253 N.W.2d 726 (1977) (police officer's sworn admission to committing perjury in earlier case admissible to attack credibility in present case).

Forty-five years ago, the *Johnson* court recognized the propriety of allowing proof that a repeat informant for the government "was completely insensitive to the obligations of his oath and . . . had, as demonstrated in a parallel case, neither compunction nor scruple against 'framing' a man." 521 F.2d at 560-61. In short, a government agent might be of honest character in his or her general affairs but willing to provide perjurious testimony to aid in the prosecution of accused criminals. If the accused can reliably prove examples of the agent having lied under oath, that evidence would be admissible in a trial

13

to show bias or prejudice as a means of impeachment distinct from general character evidence.

That sort of bias may be proved in the same manner as other forms of witness bias or prejudice. A party may challenge the witness with specific instance evidence tending to establish the bias or prejudice and, in turn, may introduce extrinsic evidence of those instances in the face of an equivocation, a claimed lapse of memory, or a denial from the witness. See *Scott*, 39 Kan. App. 2d at 56; *Johnson*, 521 F.2d at 562 & n.13 ("[I]t is the universal holding of the authorities that as to bias the cross-examiner is not bound by the answer[,]" so extrinsic evidence may be admitted.); Wright & Miller, 27 Federal Practice and Procedure:  Evidence § 6095 (2d ed.).[2]

[2]As with other forms of relevant evidence, the district court retains the discretion to exclude specific instance evidence if its prejudice outweighs its probative value. *State v. Miller*, 308 Kan. 1119, 1167, 427 P.3d 907 (2018). In that context, prejudice includes potential juror confusion arising from substantially conflicting accounts of the specific instances or an inordinate consumption of trial time. See *State v. Graham*, 244 Kan. 194, 199, 768 P.2d 259 (1989); *State v. Boysaw*, 52 Kan. App. 2d 635, 645, 372 P.3d 1261 (2016), *aff'd* 309 Kan. 526, 439 P.3d 909 (2019).

The District of Columbia appellate courts have regularly explored what they have referred to as "corruption bias." See *Smith v. United States*, 180 A.3d 45, 51 (D.C. App. 2018); *Coates v. United States*, 113 A.3d 564, 566, 569 (D.C. App. 2015); *Longus*, 52 A.3d 852-53. As we have indicated, the bias rests in a witness' willingness to corrupt the truth-seeking function of the judicial process—most particularly in jury trials—by knowingly testifying falsely himself or herself or otherwise procuring false evidence, often by pressuring others to perjure themselves. *Longus*, 52 A.3d at 854; see also *Coates*, 113 A.3d at 572-73 (citing *Longus*, 52 A.3d at 852). Conceptually, corruption bias carries forward the recognized impeachment rules outlined in *Johnson*, 521 F.2d at 560-64 & nn.12-13, and the authorities cited there. Those principles governing impeachment of a witness based on bias—whether rooted in a personal predisposition for

14

or against a party or in an intent to corrupt the judicial process with perjurious testimony—are fully consistent with the rules of evidence in Kansas.

The circumstances here present a near paradigmatic example of corruption bias. In a diversion agreement to resolve his own prosecution for official misconduct, Eberle has admitted he twice knowingly testified falsely in Bollig's prosecution, once in the preliminary hearing and once in front of the jury. The admission would seem to be indisputable, although Eberle theoretically could say he lied about committing perjury in Bollig's case to get an advantageous result in his own case. That would be a legal and logical curlicue just about equally demonstrative of corruption bias. But the scope of Eberle's bias and, in turn, his potentially false testimony hasn't been established. The diversion agreement doesn't purport to be a full accounting of Eberle's perjury. Bollig should have the opportunity to develop and present evidence on Eberle's corruption bias in a hearing on his new trial motion.

Eberle's demonstrable perjury in the prosecution of Bollig actually serves twin evidentiary purposes in assessing the new trial motion. The false evidence may have had an adverse substantive impact on the outcome of various proceedings in that prosecution, most notably, of course, the jury trial. That is, the jurors may have materially relied on perjurious statements in arriving at their verdicts. Because Eberle has admitted giving knowingly false testimony as part of the State's case, Bollig should be permitted to probe the extent of that misconduct in his case. If Eberle offered false testimony about other matters in Bollig's trial, the perjurious statements may have substantively undermined the reliability of the outcome.

Apart from the substantive effect of that misconduct, Eberle's decision to deliberately testify falsely also supports corruption bias. As we have explained, corruption bias—like other forms of bias or prejudice—reflects an appropriate tool for witness impeachment. A fact-finder may, then, reasonably decide to give little or no

15

credence to an obviously biased witness. Again, given Eberle's admissions in his diversion agreement, Bollig has a good-faith basis to explore the extent of Eberle's corruption bias as part of an evidentiary hearing on his new trial motion. Additional instances of Eberle's perjury in this case or a pattern of presenting false evidence across criminal prosecutions would strengthen his impeachment by corruption bias and, in turn, would tend to discredit his testimony generally.

Under the circumstances, the State cannot very well dodge that sort of inquiry with its claim of "fishing expedition"—a phrase that in legal parlance has come to signify the attempt of one litigant to rummage around more or less randomly, typically using evidentiary hearings or discovery tools, in a search for evidence adverse to an opposing litigant without any reason to believe such evidence exists. Here, the State presented, albeit unwittingly, the perjured testimony of Eberle in service of Bollig's prosecution and conviction. In the face of Eberle's clear admission of lying under oath in this case, Bollig should be afforded the opportunity to explore the depth of that misconduct, both in this case and in other prosecutions as bearing on Eberle's corruption bias.

Because the Kansas evidence rules permit Bollig to develop the extent of Eberle's corruption bias through specific instances of his giving perjurious testimony in this or other criminal prosecutions, we need not decide whether the rights of criminal defendants to confront the witnesses against them guaranteed in the Sixth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights would independently permit that sort of cross-examination. See *Lyng v. Northwest Indian Cemetery Prot. Assn.*, 485 U.S. 439, 445-46, 108 S. Ct. 1319, 99 L. Ed. 2d 534 (1988) (courts should refrain from deciding constitutional issues if case may be resolved on other grounds).

The United States Supreme Court has recognized that in some circumstances statutory restrictions on what may be admitted as evidence must yield to a criminal

16

defendant's Sixth Amendment right of confrontation. *Davis v. Alaska*, 415 U.S. 308, 319-20, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). The constitutional right necessarily includes effective cross-examination to expose a witness' "possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." 415 U.S. at 316. In *Davis*, the Court held that a trial court committed reversible constitutional error by relying on an Alaska statute keeping juvenile prosecutions confidential to prevent the defendant from cross-examining a key witness against him and presenting other evidence showing the witness remained on probation in a juvenile case and, therefore, had an incentive to curry favor with the State. 415 U.S. at 308.

Citing *Davis*, this court held that a criminal defendant's right of confrontation overrode the limitation in K.S.A. 60-422(d) on specific instance evidence to permit cross-examination and the admission of other evidence to show that the victim in a rape case had made false accusations of sexual assault on other occasions. *State v. Barber*, 13 Kan. App. 2d 224, 226, 766 P.2d 1288 (1989). More recently, other courts have recognized the constitutional right of confrontation as an alternative basis for admitting evidence of specific instances of a state's witness having testified perjuriously to show corruption bias. See *Coates*, 113 A.3d at 572-73.

*Denial of Evidentiary Hearing Cannot Be Treated as Harmless*

In its motion for reconsideration, the State posits that the extent of Eberle's perjurious conduct as a law enforcement officer testifying in this case or other criminal prosecutions would make no difference. The premises underlying the argument are askew and the conclusion unpersuasive. Under the circumstances, Bollig should be allowed to develop an evidentiary record:  The opportunity to make his case for a new trial because of Eberle's dereliction. We say no more than that.

First, the State suggests the jury must have disbelieved Eberle when he testified that Bollig confessed to putting Mifepristone in his girlfriend's pancakes because it found him not guilty of the charged murder of the fetus. As we have said, Bollig denied making such a statement. But the jury could have credited Eberle's testimony and concluded there was a reasonable doubt that Bollig's actions caused the miscarriage. The jury heard expert medical testimony that a significant number of pregnancies end with spontaneous miscarriages, a possibility the physicians could not rule out in this case. We can't say how much weight the jury gave Eberle's testimony, and there was substantial evidence of Bollig's guilt apart from that testimony. But we may fairly presume the jurors would have been more skeptical of Eberle's testimony if they knew he was an admitted perjurer. And that skepticism presumably would have been proportionate to the nature and extent of his perjury, at least to some outer point of diminishing returns.

Second, the State correctly says the text messages retrieved from Bollig's smartphone formed the backbone of the conspiracy charge on which the jury did convict him. And that evidence would have been undiminished in the jurors' eyes, even if they knew Eberle perjured himself during the trial. But that evidence was available to the State at trial only because the district court denied Bollig's motion to suppress—a decision the district court predicated on Eberle and Campbell being more credible witnesses than Bollig at the pretrial hearings. On that basis, the district court discarded Bollig's testimony that he consented to the search of his smartphone only because of specific promises Eberle and KBI Agent Campbell made to him. Eberle and Campbell testified in summary fashion that they neither threatened Bollig nor made promises to him. Agent Campbell has been mostly a spectral presence in this case. He testified at one of the two suppression hearings. And he testified only briefly during the trial, providing no details about the interviews with Bollig. In short, Eberle was the law enforcement face of the investigation, particularly regarding direct contact with Bollig.

We have no way of knowing what Eberle would say in an evidentiary hearing. Neither, of course, did the district court. We, likewise, have no idea what Eberle may have told the law enforcement officers investigating him and how that compares to what he eventually admitted in the diversion agreement. The gravity of Eberle's apparent willingness to commit perjury to advance the successful prosecution of Bollig—conduct deliberately aimed at corrupting the mission of the criminal justice system as a truth-seeking process in which a person's liberty hangs in the balance—calls for an evidentiary hearing on the motion for a new trial.

Even if Eberle were to admit and minimize his perjury on other occasions or to deny giving any other perjurious testimony, the district court might be persuaded that those characterizations were themselves prevarications based on Eberle's demeanor and manner in responding to surgical questioning about his misconduct. *State v. Scaife*, 286 Kan. 614, 624, 186 P.3d 755 (2008) ("[T]he ability to observe the declarant is an important factor in determining whether he or she is being truthful."); *Franco*, 49 Kan. App. 2d at 936 ("'The judicial process treats an appearance on the witness stand, with the taking of an oath and the rigor of cross-examination, as perhaps the most discerning crucible for separating honesty and accuracy from mendacity and misstatement.'") (quoting *State v. Bellinger*, 47 Kan. App. 2d 776, 787, 278 P.3d 975 [2012] [Atcheson, J., dissenting]). Bollig may be able to present reliable evidence from other witnesses that Eberle offered perjured testimony in addition to what he has admitted in the diversion agreement. An evidentiary hearing, then, might persuade the district court to take a different view on the merits of Bollig's request for a new trial. Or it might not.

The district court could conclude that it should have ruled differently on the suppression motion, which would have substantially limited the State's evidence particularly bearing on the conspiracy, or that a jury realistically might have viewed the evidence differently, depending on the scope of Eberle's perjurious testimony during the trial. Conversely, the district court might well find no legally sufficient reason to grant

Bollig a new trial. Either way, however, the district court's conclusion would be based on a full airing of the relevant circumstances, something that seems to have been lost in the denial of the motion summarily based only on the lawyers' arguments. We, of course, do not mean to suggest how the new trial motion ultimately ought to be decided.

For those reasons, we find the district court should have granted Bollig an evidentiary hearing on his motion for a new trial. We, therefore, reverse the denial of the motion and remand for an evidentiary hearing—assuming Bollig still wants one—consistent with this opinion.

Reversed and remanded with directions.